Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,

                     Plaintiffs,

           -against-

ALFORD SMITH, M.D., STRATEGIC MEDICAL
INTIATIVES P.C. a/k/a STRATEGIC MEDICAL
INITIATIVES P.C., ALFORD A. SMITH M.D., P.C.,
MARIA BUSLON, P.T. a/k/a MARIA MASIGLA, MSB
PHYSICAL THERAPY, P.C., M BUSLON PHYSICAL
THERAPY, P.C., DARREN T. MOLLO, D.C., ACH
CHIROPRACTIC, P.C., ENERGY CHIROPRACTIC, P.C.,
CHARLES DENG, L.Ac., KINGS REHAB
ACUPUNCTURE P.C., ZHONG QING ZHOU, L.Ac.,
CYNTHIA JEAN-BAPTISTE, N.P., EBERE ETUFUGH-
NWANKPA, N.P., NKIRUKA OKOYECHIRA, N.P.,
ELIZABETH ALINA JEN, P.A., TATIANA RYBAK,
SUSAN TUANO, WILMA TANGLAO, and JOHN DOE
DEFENDANTS 1-10,

                  Defendants.

-----------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $340,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported examinations, "dry needling" injections, physical therapy, chiropractic, and acupuncture (collectively the "Fraudulent Services") allegedly provided to New York automobile accident victims ("Insureds").

2.    The Fraudulent Services were provided, to the extent that they were provided at all, pursuant to the dictates of unlicensed non-physicians that illegally owned and controlled a medical clinic located at 1786 Flatbush Avenue, Brooklyn, New York (the "Flatbush Clinic"), as well as the purported healthcare practices operating therefrom, including Defendants Strategic Medical Intiatives P.C. a/k/a Strategic Medical Initiatives P.C. ("Strategic Medical"), Alford A. Smith M.D., P.C. ("Alford Smith P.C."), MSB Physical Therapy, P.C. ("MSB PT"), M Buslon Physical Therapy, P.C. ("M Buslon PT"), ACH Chiropractic, P.C. ("ACH Chiro"), Energy Chiropractic, P.C. ("Energy Chiro"), Kings Rehab Acupuncture P.C. ("Kings Acupuncture"), and unincorporated acupuncture practice operating under Defendant Zhong Qing Zhou, L.Ac.'s professional license ("Zhou Acupuncture").

3.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,000.000.00 in pending no-fault insurance claims that have been

submitted by or on behalf of Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture (collectively the "Provider Defendants") because:

(i)   the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)   in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)   in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees;

(v)   Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture were fraudulently and unlawfully incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities, and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vi)   in many cases, the Fraudulent Services billed through Strategic Medical and Alford Smith P.C. were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of purported multi-disciplinary healthcare clinics (the "Clinics") throughout the New York metropolitan area where Alford Smith, M.D., Strategic Medical, and Alford Smith P.C. purported to provide the Fraudulent Services.

4.   The Defendants fall into the following categories:

(i)   Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture (collectively the "Provider Defendants") are fraudulently incorporated, owned, and/or controlled professional corporations (or, in the case of Zhou Acupuncture, an unincorporated acupuncture practice) through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)   Defendants Alford Smith, M.D. ("Smith"), Maria Buslon, P.T. a/k/a Maria Masigla ("Buslon"), Darren T. Mollo, D.C. ("Mollo"), Charles Deng, L.Ac. ("Deng"), and Zhong Qing Zhou ("Zhou") (collectively the "Nominal Owner

3

Defendants") are licensed medical professionals that falsely purported to own and control the Provider Defendants, and purported to perform many of the Fraudulent Services.

(iii)    Defendants Cynthia Jean-Baptiste, N.P. ("Jean-Baptiste"), Ebere Etufugh-Nwankpa, N.P. ("Etufugh-Nwankpa"), and Elizabeth Alina Jen, P.A. ("Jen") are two nurse practitioners and a physician assistant, respectively, who were associated with Strategic Medical and Alford Smith P.C. as independent contractors, and purported to perform many of the Fraudulent Services at Strategic Medical and Alford Smith P.C.

(iv)    Defendant Nkiruka Okoyechira, N.P. ("Okoyechira") is a nurse practitioner who was associated with Strategic Medical as an independent contractor, and purported to perform many of the Fraudulent Services at Strategic Medical.

(v)    Defendants Tatiana Rybak ("Rybak"), Susan Tuano, ("Tuano"), Wilma Tanglao ("Tanglao"), and John Doe Defendants 1-10 (collectively the "Management Defendants") are not and never have been licensed healthcare professionals, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the Provider Defendants' healthcare practices in contravention of New York law.

5.    As discussed below, Defendants at all relevant times have known that:

(i)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees;

(v)    Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture were fraudulently incorporated, owned, and/or controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vi)   in many cases, the Fraudulent Services billed through Strategic Medical and Alford Smith P.C. were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of purported multi-disciplinary healthcare clinics (the "Clinics") through the New York metropolitan area where Smith, Strategic Medical, and Alford Smith P.C. purported to provide the Fraudulent Services.

6.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

7.     The charts annexed hereto as Exhibits "1" – "8" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

8.     The Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted through the present day.

9.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $340,000.00.

## THE PARTIES

### I.    Plaintiffs

10.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

11.    Defendant Smith resides in and is a citizen of New York. Smith was licensed to practice medicine in New York on October 17, 1983, falsely purported to own and control Defendants Strategic Medical and Alford Smith P.C., and purported to provide many of the Fraudulent Services.

12.     Defendant Strategic Medical is a fraudulently and unlawfully owned and controlled New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

13.     Strategic Medical was incorporated on March 14, 2005, is nominally owned on paper by Smith, but in actuality has been owned and controlled by unlicensed non-physicians since at least June 2018, in contravention of New York law.

14.     Strategic Medical was dissolved by proclamation on April 27, 2011 and its authority to do business in New York annulled by the New York Secretary of State.

15.     At all relevant times discussed herein, Strategic Medical was not authorized by the New York State Education Department to operate as a medical practice in New York State.

16.     Defendant Alford Smith P.C. is a fraudulently and unlawfully owned and controlled New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

17.     Alford Smith P.C. was incorporated on December 8, 1992, is nominally owned on paper by Smith, but in actuality has been owned and controlled by unlicensed non-physicians since at least June 2018, in contravention of New York law.

18.     Defendant Buslon resides in and is a citizen of Florida. Buslon was licensed to practice physical therapy in New York on March 24, 1999, falsely purported to own and control Defendants MSB PT and M Buslon PT.

19.     Defendant MSB PT is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business in New York, through which many

6

of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

20.     MSB PT was fraudulently incorporated on April 1, 2016, is nominally owned on paper by Buslon, but in actuality has always been owned and controlled by unlicensed, non-physical therapists in contravention of New York law.

21.     Defendant M Buslon PT is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

22.     M Buslon PT was fraudulently incorporated on May 7, 2018, is nominally owned on paper by Buslon, but in actuality has always been owned and controlled by unlicensed, non-physical therapists in contravention of New York law.

23.     Defendant Mollo resides in and is a citizen of New York. Mollo was licensed to practice chiropractic in New York on September 23, 1999, falsely purported to own and control Defendants ACH Chiro and Energy Chiro, and purported to provide many of the Fraudulent Services.

24.     Energy Chiro is a fraudulently incorporated New York chiropractic professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

25.     Energy Chiro was fraudulently incorporated on October 21, 2016, is nominally owned on paper by Mollo, but in actuality has always been owned and controlled by unlicensed, non-chiropractors in contravention of New York law.

26.    At all relevant times discussed herein, Energy Chiro was not licensed by the New York State Education Department to operate as a chiropractic practice in New York State.

27.    ACH Chiro is a fraudulently incorporated New York chiropractic professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

28.    ACH Chiro was fraudulently incorporated on September 28, 2015, is nominally owned on paper by Mollo, but in actuality has always been owned and controlled by unlicensed, non-chiropractors in contravention of New York law.

29.    Defendant Deng resides in and is a citizen of New York. Deng was licensed to practice acupuncture in New York on January 3, 1994, falsely purported to own and control Defendant Kings Acupuncture, and purported to provide many of the Fraudulent Services.

30.    Kings Acupuncture is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

31.    Kings Acupuncture was fraudulently incorporated on May 31, 2017, is nominally owned on paper by Deng, but in actuality has always been owned and controlled by unlicensed, non-acupuncturists in contravention of New York law.

32.    Defendant Qing resides in and is a citizen of New York. Qing was licensed to practice acupuncture in New York on October 6, 2016, falsely purported to own and control Zhou Acupuncture, and purported to provide many of the Fraudulent Services.

33.     Zhou Acupuncture is an unincorporated acupuncture practice that is purportedly owned by Zhou, but in actuality has been owned and controlled by unlicensed, non-acupuncturists since at least 2018.

34.     Defendant Jean-Baptiste resides in and is a citizen of New York. Jean-Baptiste was licensed as a nurse practitioner in New York on April 9, 2018, and purported to provide many of the Fraudulent Services.

35.     Defendant Etufugh-Nwankpa resides in and is a citizen of New York. Etufugh-Nwankpa was licensed as a nurse practitioner in New York on March 8, 2012, and purported to provide many of the Fraudulent Services.

36.     Defendant Okoyechira resides in and is a citizen of New York. Okoyechira was licensed as a nurse practitioner in New York on July 12, 2016, and purported to provide many of the Fraudulent Services.

37.     Defendant Jen resides in and is a citizen of New York. Jen was licensed as a physician assistant in New York on July 13, 2017, and purported to provide many of the Fraudulent Services.

38.     Defendant Rybak resides in and is a citizen of Florida. Rybak has never been a licensed healthcare professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

39.     Defendant Tuano resides in and is a citizen of New York. Tuano has never been a licensed healthcare professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

40.     Defendant Tanglao resides in and is a citizen of New York. Tanglao has never been a licensed healthcare professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

41.     Upon information and belief, John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed healthcare professionals, yet – together with Rybak, Tuano, and Tanglao – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

43.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

44.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

45.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

46.     GEICO underwrites automobile insurance in New York.

47.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

48.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, physical therapy services, and acupuncture services.

49.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

50.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

11

51.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ... .

52.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

53.    New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

54.    Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

55.    Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if its record owner does not practice his or her profession through the professional corporation.

56.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

57.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

58.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

59.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule")

60.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the

specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

61.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Prior Litigation and the Antecedents of the Defendants' Fraudulent Scheme

62.     Several of the Defendants have a history of operating fraudulent healthcare practices and using them as vehicles to submit large-scale, fraudulent no-fault insurance billing to GEICO and other insurers.

## A.     The First Parisien Action

63.     For example, in February 2016, GEICO sued Buslon, Mollo, Deng, Tuano, and Tanglao, among others, in an action entitled Government Employees Insurance Co., et al. v. Parisien, et al., E.D.N.Y. Case No. 1:16-cv-00818-RRM-RER (the "First Parisien Action").

64.     In the First Parisien Action—much as in the present case—GEICO alleged, among other things, that Buslon, Mollo, Deng, as well as two physicians named Jules Parisien a/k/a Jules Francois Parisien, M.D. ("Parisien") and Francis J. Lacina, D.O. ("Lacina"), falsely posed as the nominal or "paper" owners of healthcare practices that secretly and unlawfully were owned and controlled behind the scenes by Tuano and Tanglao, among others, who used them as vehicles to submit a large amount of fraudulent no-fault insurance billing to GEICO and other insurers.

65.     In the First Parisien Action—much as in the present case—the healthcare practices that nominally were owned on paper by Parisien and Lacina, but actually were unlawfully owned and controlled by Tuano and Tanglao, among others, operated from, among other places, the Flatbush Clinic.

66.     Shortly after discovery commenced in the First Parisien Action, GEICO served subpoenas on Parisien, Lacina, Buslon, Mollo, and Deng's banks, seeking bank records from the period when the events giving rise to the First Parisien Action occurred.

67.     Parisien, Lacina, Buslon, Mollo, and Deng moved to quash or modify GEICO's bank subpoenas, contending—in substance—that the subpoenas were overly broad.

68.     GEICO opposed the motion to quash, noting, among other things, that Parisien, Lacina, Buslon, Mollo, and Deng's bank records were highly relevant to prove GEICO's allegations that their professional practices were secretly and unlawfully owned and controlled by unlicensed non-physicians, including Tuano and Tanglao.

69.     Ultimately, the Court in the First Parisien Action denied Parisien, Lacina, Buslon, Mollo, and Deng's motion to quash in its entirety, based on a determination that the bank records sought by the subpoenas were relevant to GEICO's claims.

70.     Parisien, Lacina, Buslon, Mollo, Deng, Tuano, and Tanglao were very concerned that disclosure of the bank records would tend to prove GEICO's allegations that Parisien, Lacina, Buslon, Mollo, and Deng's professional healthcare practices were secretly and unlawfully owned and controlled by individuals who were not licensed healthcare providers, including Tuano and Tanglao.

71.     Accordingly, shortly after the Court in the First Parisien Action denied the motion to quash GEICO's bank subpoenas, Parisien, Lacina, Buslon, Mollo, Deng, Tuano, and Tanglao entered into a settlement with GEICO in the First Parisien Action.

72.     Pursuant to the settlement agreement in the First Parisien Action, Mollo warranted and represented that, other than entities called Island Life Chiropractic Pain Care, P.L.L.C. and Mollo Chiropractic P.L.L.C., he owned no other professional entities, regardless of form, that had submitted any billing of any kind to GEICO that remained outstanding and unpaid.

73.     However, on August 24, 2016, the date when Mollo executed the settlement agreement in the First Parisien Action, Mollo purported to be the owner of record of ACH Chiro.

74.     What is more, on August 24, 2016, the date when Mollo executed the settlement agreement in the First Parisien Action, ACH Chiro had thousands of dollars in outstanding billing to GEICO.

75.     The reason why Mollo gave a warranty to the effect that he did not own ACH Chiro, despite the fact that Mollo was listed as the record owner of ACH Chiro, was that Mollo was never actually the true owner of ACH Chiro. Rather, and as set forth below, at all relevant times ACH Chiro secretly and unlawfully was owned and controlled by unlicensed non-chiropractors, including Rybak, Tuano, and Tanglao.

**B.     The Second Parisien Action**

76.     Following the settlement in the First Parisien Action, Tuano and Tanglao, among others, continued to unlawfully own and control multiple healthcare practices and used them to submit a large amount of fraudulent no-fault insurance billing to GEICO and other insurers.

77.     Accordingly, in April 2018, GEICO once again sued Tuano, Tanglao, Parisien, and Lacina, among others, in an action entitled <u>Government Employees Insurance Co., et al. v. Parisien, et al.</u>, E.D.N.Y. Case No. 1:18-cv-02176-ARR-RER (the "Second Parisien Action").

78.     In the Second Parisien Action—much as in the present case and the First Parisien Action—GEICO alleged, among other things, that Parisien, Lacina, and Harry Keith Monroe, M.D. ("Monroe"), an additional physician that was also willing to sell the use of his professional license, falsely posed as the nominal or "paper" owners of medical practices that secretly and unlawfully were owned and controlled behind the scenes by Tuano and Tanglao, among others, who used them as vehicles to submit a large amount of fraudulent no-fault insurance billing to GEICO and other insurers.

79.     In the Second Parisien Action—much as in the present case and the First Parisien Action—the medical practices that were nominally owned by Parisien, Lacina, and Monroe, but actually were owned and controlled by Tuano and Tanglao, among others, operated from, among other places, the Flatbush Clinic.

80.     The Complaint in the Second Parisien Action alleged that two licensed nurse practitioners, Renee Ann Denobrega ("Denobrega") and Shaneeza O'Brian ("O'Brian"), purported to perform many of the fraudulent services—including examinations and dry-needling—that were billed through Parisien's medical practices to GEICO.

81.     Shortly after filing the Complaint in the Second Parisien Action, GEICO obtained sworn statements from both Denobrega and O'Brian.

82.     Denobrega and O'Brian stated that they were contacted by a recruiter named "Nikki" who ultimately arranged for them to interview with someone named "Barbara" at the Flatbush Clinic.

83.     "Barbara" is a pseudonym used by Defendant Rybak to disguise her involvement with the fraudulent activities at the Flatbush Clinic and other New York area no-fault clinics.

84.     Both Denobrega and O'Brian stated that they were ultimately hired by "Barbara" to work for Parisien's medical practices at the Flatbush Clinic, among other locations.

85.     Both Denobrega and O'Brian stated that "Barbara" controlled the Flatbush Clinic, and that they reported to her.

86.     Denobrega and O'Brian reported directly to "Barbara" and stated that "Barbara" and other laypersons working under "Barbara" pressured them to perform specific healthcare services at the Flatbush Clinic.

87.     Both Denobrega and O'Brian stated that they were not supervised by Parisien or any other healthcare professional during their time at the Flatbush Clinic.

88.     In keeping with the fact that "Barbara" (i.e., Rybak) controlled the Flatbush Clinic and the healthcare practices operating therefrom, O'Brian did not meet Parisien until she had already been working at the Flatbush Clinic for a month. O'Brian further stated that Parisien was not regularly present at the Flatbush Clinic and she only saw him twice during the few months she worked at the clinic.

89.     Despite purportedly working for Parisien and his supposed medical practices, Denobrega never met or spoke with Parisien during her time at the Flatbush Clinic.

90.     Both Denobrega and O'Brian stated that they were paid, at least in part, as 1099 independent contractors.

91.     O'Brian stated that a doctor named Ksenia Pavlova Rybak ("K. Rybak") also worked at the Flatbush Clinic and that "Barbara" was K. Rybak's mother-in-law.

92.     At all relevant times herein, K. Rybak's mother-in-law was Tatiana Rybak.

93.     Oleg Rybak, ("O. Rybak"), Tatianna Rybak's son and K. Rybak's husband, served as a collection attorney for many of the fraudulent healthcare practices operating from the Flatbush Clinic.

94.     In June 2018, shortly after GEICO obtained Denobrega and O'Brian's sworn statements, and before GEICO could conduct any substantial discovery in the Second Parisien Action, Parisien, Lacina, Tuano, and Tanglao entered into a settlement with GEICO of the Second Parisien Action.

**III.     The Defendants' Fraudulent Scheme**

**A.     The Fraudulent Incorporation and Operation of the Provider Defendants**

**1.     The Fraudulent Ownership and Operation of Strategic Medical and Alford Smith P.C.**

95.     As the result of the First Parisien Action and Second Parisien Action, the Management Defendants knew that they could not longer use Parisien, Lacina, or Monroe as the nominal or "paper" owners of healthcare practices under their unlawful ownership and control.

96.     Accordingly, in or about June 2018, the Management Defendants approached Smith, a different licensed physician who owned two dormant medical practices, namely Strategic Medical and Alford Smith P.C. In exchange for compensation from the Management Defendants, Smith agreed to sell true beneficial ownership and control over Strategic Medical and Alford Smith P.C. to the Management Defendants, and to remain listed as the nominal or "paper" owner of Strategic Medical and Alford Smith P.C. in order to conceal the Management Defendants' unlawful ownership and control over those professional corporations.

97.     In exchange for compensation from the Management Defendants, and to induce the New York State Education Department (the "Education Department") to continue to authorize Alford Smith P.C. to operate as a medical practice, Smith also agreed to falsely represent in

corporate filings with New York State that he was, and remained, the true and sole shareholder, director, and officer of Alford Smith P.C. and that he truly owned, controlled, and practiced through the professional corporation.

98.     Similarly, Smith agreed to falsely represent in corporate filings with New York State, that he was, and remained, the true and sole shareholder, director, and officer of Strategic Medical and that he truly owned, controlled, and practiced through the professional corporation.

99.     However, with respect to Strategic Medical, the Management Defendants never actually bothered to confirm that the professional corporation was still authorized to do business in New York and to operate as a medical practice in New York. In fact, Strategic Medical has not been authorized to do business in New York or to operate as a medical practice in New York since at least April 27, 2011.

100.     Thereafter, the Management Defendants caused Strategic Medical and Alford Smith P.C. to begin operating at the Flatbush Clinic, as replacements for the previous medical practices that supposedly had been owned by Parisien, Lacina, and Monroe, but which – like Strategic Medical and Alford Smith P.C. – actually had been secretly and illegally owned and controlled by the Management Defendants.

101.     The Management Defendants also caused Strategic Medical and Alford Smith P.C. to commence operations on a transient basis from other New York area clinics, by paying kickbacks to the owners of the clinics in exchange for patient referrals to Strategic Medical and Alford Smith P.C.

102.     Once Smith entered into the secret scheme with the Management Defendants in or about June 2018, Smith ceded true beneficial ownership and control over the professional corporations to the Management Defendants.

103.    The Management Defendants—rather than Smith—provided all start-up costs and investment in the previously dormant entities. Smith did not incur any costs to reestablish Strategic Medical or Alford Smith P.C.'s practices, nor did he invest any money to reestablish the dormant professional corporations he purportedly owned.

104.    Since at least June 2018, Smith has not been the true or sole shareholder, director, or officer of Strategic Medical or Alford Smith P.C., and has not had any true ownership interest in or control over the professional corporations.

105.    Since at least June 2018, true ownership and control over Strategic Medical and Alford Smith P.C. has rested with the Management Defendants, who used the façade of the professional corporations to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

106.    Since at least June 2018, Smith exercised absolutely no control over or ownership interest in Strategic Medical or Alford Smith P.C. All decision-making authority relating to the operation and management of Strategic Medical and Alford Smith P.C. was vested entirely with the Management Defendants. In addition, Smith never controlled or maintained any of Strategic Medical or Alford Smith P.C.'s books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the professional corporations' financial affairs; never hired or supervised any of professional corporations' employees or independent contractors; and was completely unaware of the most fundamental aspects of how Strategic Medical and Alford Smith P.C. operated.

107.    In reality, Smith was nothing more than the Management Defendants' de facto employee at Strategic Medical and Alford Smith P.C.

108.    To conceal their true ownership of and control over Smith's professional corporations, while simultaneously effectuating pervasive, total control over the operation and management of them, the Management Defendants arranged to have Smith, Strategic Medical, and Alford Smith P.C. enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from Strategic Medical and Alford Smith P.C. to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of the professional corporations' business; or (ii) the income generated by the professional corporations.

109.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Strategic Medical and Alford Smith P.C.; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Strategic Medical and Alford Smith P.C..

110.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Smith, Strategic Medical, Alford Smith P.C., and the Management Defendants was to maintain Strategic Medical and Alford Smith P.C. in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivable, and any revenues that might be generated therefrom.

**2.      The Fraudulent Incorporation of MSB PT and M Buslon PT**

111.      After GEICO commenced the First Parisien Action, the Management Defendants realized that GEICO knew they unlawfully owned and controlled the existing physical therapy practices that were fraudulently incorporated under Buslon's license. As a result, the Management Defendants knew that their ability to continue submitting fraudulent no-fault billing through those practices would be limited.

112.      Accordingly, the Management Defendants once again approached Buslon, and once again offered to purchase the use of her physical therapy license so that they could fraudulently incorporate MSB PT, a new physical therapy professional corporation, with a new tax identification number, that was not yet known to GEICO and other insurers, and that would permit the Management Defendants and Buslon to continue their fraudulent and unlawful scheme.

113.      In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing MSB PT to operate as a physical therapy practice, the Management Defendants once again entered into a secret scheme with Buslon. In exchange for a designated salary or other form of compensation, in mid-2016 Buslon agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that she was the true shareholder, director and officer of MSB PT and that she truly owned and controlled the professional corporation.

114.      As she had done in the past with other physical therapy practices that she falsely purported to own, once MSB PT was fraudulently incorporated on April 1, 2016, Buslon ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

23

115.     The Management Defendants – rather than Buslon – provided all start-up costs and investment in MSB PT. Buslon did not incur any costs to establish MSB PT's practice, nor did she invest any money in the professional corporation she purportedly owned.

116.     Thereafter, the Management Defendants caused MSB PT to commence operations at the Flatbush Clinic, alongside the other fraudulently incorporated healthcare practices that they secretly and unlawfully owned and controlled.

117.     Buslon never was the true shareholder, director, or officer of MSB PT, and never had any true ownership interest in or control over the professional corporation. True ownership and control over MSB PT always rested entirely with the Management Defendants, who used the façade of MSB PT to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

118.     Buslon exercised absolutely no control over or ownership interest in MSB PT. All decision-making authority relating to the operation and management of MSB PT was vested entirely with the Management Defendants. In addition, Buslon never controlled or maintained any of MSB PT's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of MSB PT's financial affairs; never hired or supervised any of MSB PT's employees or independent contractors; and was completely unaware of the most fundamental aspects of how MSB PT operated.

119.     In reality, Buslon was nothing more than the Management Defendants' de facto employee at MSB PT.

120. To conceal their true ownership of and control over MSB PT, while simultaneously effectuating pervasive, total control over the operation and management of MSB PT, the Management Defendants arranged to have Buslon and MSB PT enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from MSB PT to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of MSB PT's business; or (ii) the income generated by MSB PT.

121. While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own MSB PT; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through MSB PT.

122. The net effect of these "management", "billing", "marketing", and "lease" agreements between Buslon, MSB PT, and the Management Defendants was to maintain MSB PT in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

123. Once GEICO began to suspect that MSB PT was engaged in fraudulent billing and treatment activities, GEICO requested that the provider submit additional verification of its no-fault insurance claims, including but not limited to, examinations under oath to determine whether the charges submitted through MSB PT were legitimate.

25

124.    Concerned that GEICO would discover their fraudulent scheme, in mid-2018 the Management Defendants once again approached Buslon, and once again offered to purchase the use of her physical therapy license so that they could fraudulently incorporate M Buslon PT.

125.    There was no legitimate reason why Buslon would need to operate two separate physical therapy professional corporations, providing the same types of physical therapy services, at the same location, at the same time or in rapid succession.

126.    The only reason why the Management Defendants and Buslon fraudulently incorporated both MSB PT and M Buslon PT in rapid succession – despite the fact that they provided the same types of services, at the same location, and were both under the nominal "ownership" of Buslon – was to reduce the volume of fraudulent no-fault insurance billing submitted through either one of the two entities, in order to avoid detection and perpetuate their fraudulent scheme.

127.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing M Buslon PT to operate a medical practice, the Management Defendants once again entered into a secret scheme with Buslon. In exchange for a designated salary or other form of compensation, in mid-2018 Buslon agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that she was the true shareholder, director and officer of M Buslon PT and that she truly owned and controlled the professional corporation.

128.    As she had done in the past with other physical therapy practices that she falsely purported to own, once M Buslon PT was fraudulently incorporated on May 7, 2018, Buslon ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

129.    The Management Defendants – rather than Buslon – provided all start-up costs and investment in M Buslon PT. Buslon did not incur any costs to establish M Buslon PT's practice, nor did she invest any money in the professional corporation she purportedly owned.

130.    Thereafter, the Management Defendants caused M Buslon PT to commence operations at the Flatbush Clinic.

131.    Buslon never was the true shareholder, director, or officer of M Buslon PT, and never had any true ownership interest in or control over the professional corporation. True ownership and control over M Buslon PT always rested entirely with the Management Defendants, who used the façade of M Buslon PT to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

132.    Buslon exercised absolutely no control over or ownership interest in M Buslon PT. All decision-making authority relating to the operation and management of M Buslon PT was vested entirely with the Management Defendants. In addition, Buslon never controlled or maintained any of M Buslon PT's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of M Buslon PT's financial affairs; never hired or supervised any of M Buslon PT's employees or independent contractors; and was completely unaware of the most fundamental aspects of how M Buslon PT operated.

133.    In reality, Buslon was nothing more than the Management Defendants' de facto employee at M Buslon PT.

134.    To conceal their true ownership of and control over M Buslon PT, while simultaneously effectuating pervasive, total control over the operation and management of M

Buslon PT, the Management Defendants arranged to have Buslon and M Buslon PT enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from M Buslon PT to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of M Buslon PT's business; or (ii) the income generated by M Buslon PT.

135.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own M Buslon PT; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through M Buslon PT.

136.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Buslon, M Buslon PT, and the Management Defendants was to maintain M Buslon PT in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

137.    In keeping with the fact that Buslon never had any legitimate ownership interest in or control over MSB PT or M Buslon PT, Buslon never even practiced physical therapy through MSB PT or M Buslon PT.

138.    For example, during the same periods when she was falsely purporting to serve as the owner of MSB PT and M Buslon PT in New York, and to practice physical therapy through MSB PT and M Buslon PT in New York, Buslon was living full-time in Miramar, Florida.

139.    Moreover, Buslon did not personally sign any of the bills that were submitted through MSB PT and M Buslon PT to GEICO, in keeping with the fact that she did not truly own either entity.

**3.    The Fraudulent Incorporation of Energy Chiro and ACH Chiro**

140.    As part of their unlawful control over the Flatbush Clinic and the professional corporations operating therefrom, in mid-2015 the Management Defendants approached Mollo and offered to purchase the use of his chiropractic license so that they could fraudulently incorporate ACH Chiro.

141.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing ACH Chiro to operate as a chiropractic practice, the Management Defendants once again entered into a secret scheme with Mollo. In exchange for a designated salary or other form of compensation, in mid-2015 Mollo agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that he was the true shareholder, director and officer of ACH Chiro and that he truly owned and controlled the professional corporation.

142.    As he had done in the past with other chiropractic practices that he falsely purported to own, once ACH Chiro was fraudulently incorporated on September 28, 2015, Mollo ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

143.    The Management Defendants – rather than Mollo – provided all start-up costs and investment in ACH Chiro. Mollo did not incur any costs to establish ACH Chiro's practice, nor did he invest any money in the professional corporation he purportedly owned.

144. Thereafter, the Management Defendants caused ACH Chiro to commence operations at the Flatbush Clinic.

145. Mollo never was the true shareholder, director, or officer of ACH Chiro, and never had any true ownership interest in or control over the professional corporation. True ownership and control over ACH Chiro always rested entirely with the Management Defendants, who used the façade of ACH Chiro to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

146. Mollo exercised absolutely no control over or ownership interest in ACH Chiro. All decision-making authority relating to the operation and management of ACH Chiro was vested entirely with the Management Defendants. In addition, Mollo never controlled or maintained any of ACH Chiro's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of ACH Chiro's financial affairs; never hired or supervised any of ACH Chiro's employees or independent contractors; and was completely unaware of the most fundamental aspects of how ACH Chiro operated.

147. In reality, Mollo was nothing more than the Management Defendants' _de facto_ employee at ACH Chiro.

148. To conceal their true ownership of and control over ACH Chiro, while simultaneously effectuating pervasive, total control over the operation and management of ACH Chiro, the Management Defendants arranged to have Mollo and ACH Chiro enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from Energy Chiro to the Management

Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of ACH Chiro's business; or (ii) the income generated by ACH Chiro.

149.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own ACH Chiro; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through ACH Chiro.

150.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Mollo, ACH Chiro, and the Management Defendants was to maintain ACH Chiro in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

151.    In fact, and as set forth above, as part of the settlement in the First Parisien Action, Mollo represented and warranted that he did not own any entities, other than Island Life Chiropractic Pain Care, P.L.L.C. and Mollo Chiropractic P.L.L.C., that had submitted any outstanding billing to GEICO. This, despite the fact that – at the time – ACH Chiro had a substantial amount of outstanding billing to GEICO. Mollo gave these false representations and warranties because he did not, in fact, own or control ACH Chiro, and was completely unaware of the most basic facts regarding its operations.

152.    Once GEICO began to suspect that ACH Chiro was engaged in fraudulent billing and treatment activities, GEICO requested that the provider submit additional verification of its

no-fault insurance claims, including but not limited to, examinations under oath to determine whether the charges submitted through ACH Chiro were legitimate.

153.    Concerned that GEICO would discover their fraudulent scheme, in late 2016 the Management Defendants once again approached Mollo, and once again offered to purchase the use of his chiropractic license so that they could fraudulently incorporate Energy Chiro.

154.    There was no legitimate reason why Mollo would need to operate two separate chiropractic professional corporations, providing the same types of chiropractic services, at the same location, at the same time or in rapid succession.

155.    The only reason why the Management Defendants and Mollo fraudulently incorporated both ACH Chiro and Energy Chiro in rapid succession – despite the fact that they provided the same types of services, at the same location, and were both under the nominal "ownership" of Mollo – was to reduce the volume of fraudulent no-fault insurance billing submitted through either one of the two entities, in order to avoid detection and perpetuate their fraudulent scheme.

156.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Energy Chiro to operate as a chiropractic practice, the Management Defendants once again entered into a secret scheme with Mollo. In exchange for a designated salary or other form of compensation, in mid-2016 Mollo agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that he was the true shareholder, director and officer of Energy Chiro and that he truly owned and controlled the professional corporation.

157.    As he had done in the past with other chiropractic practices that he falsely purported to own, once Energy Chiro was fraudulently incorporated on October 21, 2016, Mollo

ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

158.    The Management Defendants – rather than Mollo – provided all start-up costs and investment in Energy Chiro. Mollo did not incur any costs to establish Energy Chiro's practice, nor did he invest any money in the professional corporation he purportedly owned.

159.    Thereafter, the Management Defendants caused Energy Chiro to commence operations at the Flatbush Clinic.

160.    Mollo never was the true shareholder, director, or officer of Energy Chiro, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Energy Chiro always rested entirely with the Management Defendants, who used the façade of Energy Chiro to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

161.    Mollo exercised absolutely no control over or ownership interest in Energy Chiro. All decision-making authority relating to the operation and management of Energy Chiro was vested entirely with the Management Defendants. In addition, Mollo never controlled or maintained any of Energy Chiro's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Energy Chiro's financial affairs; never hired or supervised any of Energy Chiro's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Energy Chiro operated.

162.    In reality, Mollo was nothing more than the Management Defendants' de facto employee at Energy Chiro.

163.    To conceal their true ownership of and control over Energy Chiro, while simultaneously effectuating pervasive, total control over the operation and management of Energy Chiro, the Management Defendants arranged to have Mollo and Energy Chiro enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from Energy Chiro to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of Energy Chiro's business; or (ii) the income generated by Energy Chiro.

164.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Energy Chiro; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Energy Chiro.

165.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Mollo, Energy Chiro, and the Management Defendants was to maintain Energy Chiro in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

## 4.    The Fraudulent Incorporation of Kings Acupuncture

166.    In early 2017, shortly after the conclusion of the First Parisien Action, the Management Defendants realized that GEICO knew they unlawfully owned and controlled the existing acupuncture practice that was fraudulently incorporated under Deng's license. As a

result, the Management Defendants knew that their ability to continue submitting fraudulent no-fault billing through that practice would be limited.

167.   Accordingly, the Management Defendants once again approached Deng, and once again offered to purchase the use of his acupuncture license so that they could fraudulently incorporate Kings Acupuncture, a new acupuncture professional corporation, with a new tax identification number, that was not yet known to GEICO and other insurers, and that would permit the Management Defendants and Deng to continue their fraudulent and unlawful scheme.

168.   In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Kings Acupuncture to operate as an acupuncturepractice, the Management Defendants once again entered into a secret scheme with Deng. In exchange for a designated salary or other form of compensation, in early 2017 Deng agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that he was the true shareholder, director and officer of Kings Acupuncture and that he truly owned and controlled the professional corporation.

169.   As he had done in the past with other acupuncture practices that he falsely purported to own, once Kings Acupuncture was fraudulently incorporated on May 31, 2017, Deng ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

170.   The Management Defendants – rather than Deng – provided all start-up costs and investment in Kings Acupuncture. Deng did not incur any costs to establish Kings Acupuncture's practice, nor did he invest any money in the professional corporation he purportedly owned.

171.    Thereafter, the Management Defendants caused Kings Acupuncture to commence operations at the Flatbush Clinic, alongside the other fraudulently incorporated healthcare practices that they secretly and unlawfully owned and controlled.

172.    Deng never was the true shareholder, director, or officer of Kings Acupuncture, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Kings Acupuncture always rested entirely with the Management Defendants, who used the façade of Kings Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

173.    Deng exercised absolutely no control over or ownership interest in Kings Acupuncture. All decision-making authority relating to the operation and management of Kings Acupuncture was vested entirely with the Management Defendants. In addition, Deng never controlled or maintained any of Kings Acupuncture's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Kings Acupuncture's financial affairs; never hired or supervised any of Kings Acupuncture's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Kings Acupuncture operated.

174.    In reality, Deng was nothing more than the Management Defendants' de facto employee at Kings Acupuncture.

175.    To conceal their true ownership of and control over Kings Acupuncture, while simultaneously effectuating pervasive, total control over the operation and management of Kings Acupuncture, the Management Defendants arranged to have Deng and Kings Acupuncture enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements

with themselves. These agreements called for exorbitant payments from Kings Acupuncture to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of Kings Acupuncture's business; or (ii) the income generated by Kings Acupuncture.

176.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Kings Acupuncture; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Kings Acupuncture.

177.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Deng, Kings Acupuncture, and the Management Defendants was to maintain Kings Acupuncture in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

**5.    The Fraudulent Ownership and Operation of Zhou Acupuncture**

178.    In or around early 2018, Deng stopped working for the Management Defendants.

179.    Accordingly, in early 2018, the Management Defendants commenced a search for yet another pliable acupuncturist who would be willing to sell the use of his acupuncture license to them so that they could unlawfully own and control an acupuncture practice.

180.    Thereafter, in January 2018, the Management Defendants recruited Zhou into their scheme. Like Deng before him, Zhou—in exchange for a designated salary or other form of compensation from the Management Defendants—agreed to serve as the nominal or "paper"

owner of Zhou Acupuncture, which ostensibly was an unincorporated sole proprietorship acupuncture practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

181.    As with Kings Acupuncture, the Management Defendants provided all start-up costs and investment in Zhou Acupuncture. Zhou did not incur any costs to establish Zhou Acupuncture's practice, nor did he invest any money in the acupuncture practice he purportedly owned.

182.    Thereafter, the Management Defendants caused Zhou Acupuncture to commence operations at the Flatbush Clinic, alongside the other fraudulently organized healthcare practices that they secretly and unlawfully owned and controlled.

183.    Zhou never was the true owner of Zhou Acupuncture, and never had any true ownership interest in or control over the medical practice. True ownership and control over Zhou Acupuncture always rested entirely with the Management Defendants, who used the façade of Zhou Acupuncture to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professional; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

184.    Zhou exercised absolutely no control over or ownership interest in Zhou Acupuncture. All decision-making authority relating to the operation and management of Zhou Acupuncture was vested entirely with the Management Defendants. In addition, Zhou never controlled or maintained any of Zhou Acupuncture's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Zhou Acupuncture's financial affairs; never hired or supervised any of

Zhou Acupuncture's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Zhou Acupuncture operated.

185.  In reality, Zhou was nothing more than the Management Defendants' de facto employee at Zhou Acupuncture.

186.  To conceal their true ownership of and control over Zhou Acupuncture, while simultaneously effectuating pervasive, total control over the operation and management of Zhou Acupuncture, the Management Defendants arranged to have Zhou enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from Zhou Acupuncture to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of Zhou Acupuncture's business; or (ii) the income generated by Zhou Acupuncture.

187.  While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Zhou Acupuncture; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through Zhou Acupuncture.

188.  The net effect of these "management", "billing", "marketing", and "lease" agreements between Zhou, Zhou Acupuncture, and the Management Defendants was to maintain Zhou Acupuncture in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

**C.     The Multi-Disciplinary Clinics and Kickbacks**

189.    In keeping with the fact that the Provider Defendants at the Flatbush Clinic were not truly owned or controlled by the Nominal Owner Defendants, the Nominal Owner Defendants did not advertise or market their services at the Flatbush Clinic to the general public, and did not engage in any other legitimate efforts to obtain patient referrals at the Flatbush Clinic.

190.    Instead, the Flatbush Clinic obtained virtually all of its patients through one of two means: referrals from personal injury attorneys or through a network of individuals (the "Runners") who were paid by the Management Defendants for each Insured that they delivered to the Flatbush Clinic for the medically-unnecessary Fraudulent Services.

191.    The personal injury attorneys referred Insureds to the Flatbush Avenue Clinic, and the Defendants accepted the referrals, without regard for the Insureds' individual presentation, symptoms, or – in many cases – the total absence of any legitimate injuries arising from any automobile accidents.

192.    Rather, the personal injury attorneys made the referrals, and the Defendants accepted the referrals, in order to generate income for themselves, not to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

193.    The personal injury attorneys benefitted from the referrals and the Defendants' subsequent purported provision of the Fraudulent Services because the Defendants' phony treatment records falsely represented that the Insureds sustained serious injuries in automobile accidents, and thereby supported the Insureds' personal injury claims.

194.    The Defendants derived significant financial benefit from the relationships with the personal injury attorneys because without the access to the Insureds provided by the referring

personal injury attorneys, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

195.    Once an Insured was delivered to the Flatbush Clinic, either by the Runners or pursuant to a referral from a personal injury attorney, either Smith or one of the physician assistants or nurse practitioners associated with Strategic Medical or Alford Smith P.C. virtually always would purport to conduct an initial examination of the Insured.

196.    Then, at the direction of the Management Defendants – and in exchange for compensation by the Management Defendants, their de facto employers – either Smith or the physician assistant or nurse practitioner performing the initial examination would refer the Insureds on to Mollo, Energy Chiro, ACH Chiro, Deng, King Acupuncture, Zhou, Zhou Acupuncture, Buslon, MSB PT, and/or M Buslon PT for medically unnecessary chiropractic, acupuncture, and physical therapy services, without regard for the Insureds' individual symptoms or presentation.

197.    The amount of compensation that the Management Defendants paid to Smith generally was based on the volume of Insureds that Smith and the licensed professionals purportedly working under him referred to Mollo, Energy Chiro, ACH Chiro, Deng, King Acupuncture, Zhou, Zhou Acupuncture, Buslon, MSB PT, and M Buslon PT, as well as on the volume of Fraudulent Services that Smith and the licensed professionals purportedly working under him purported to provide to the Insureds.

198.    Smith and the other licensed professional associated with Strategic Medical and Alford Smith P.C. referred Insureds to Mollo, Energy Chiro, ACH Chiro, Deng, King Acupuncture, Zhou, Zhou Acupuncture, Buslon, MSB PT, and M Buslon PT, and they accepted

the referrals, despite their actual knowledge that the Fraudulent Services played no genuine role in the treatment or care of the Insureds.

199.    In addition to treatment they purportedly provided at the Flatbush Clinic, Strategic Medical and Alford Smith P.C. also operated on an itinerant basis from various Clinics throughout the New York area, which were situated at, among other places, the following locations:

(i)      1552 Ralph Avenue, Brooklyn, New York;

(ii)     172-17 Jamaica Avenue, Jamaica, New York;

(iii)    1786 Flatbush Avenue, Brooklyn, New York;

(iv)     2184 Flatbush Avenue, Brooklyn, New York;

(v)      2363 Ralph Avenue, Brooklyn, New York;

(vi)     3041 Avenue U, Brooklyn, New York;

(vii)    552 East 180th Street, Bronx, New York;

(viii)   9025 Rockaway Boulevard, Ozone Park, New York;

(ix)     941 Burke Avenue, Bronx, New York; and

(x)      95 East Merrick Road, Valley Stream, New York.

200.    In keeping with Smith's general lack of awareness regarding the operations of professional corporations he falsely purported to own, Smith testified at a January 2019 examination under oath that he was unaware that Strategic Medical was providing services at various of the above-referenced Clinics.

201.    Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

202.    The Management Defendants obtained access to the Clinics for the Provider Defendants by paying kickbacks to the individuals and entities that owned and controlled the Clinics.

203.    The kickbacks were disguised as ostensibly legitimate fees to "lease" space or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the Clinics and their owners to provide access to Insureds and to refer the Insureds to Strategic Medical or Alford Smith P.C. for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

204.    In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to Strategic Medical or Alford Smith P.C. for medically unnecessary treatment, regardless of individual symptoms or presentation by the patient.

205.    The referrals typically were made by a receptionist or some other non-medical personnel at the Clinics who simply directed or "steered" the Insureds to whichever Provider Defendant was active during that time period and present at that particular Clinic on that day.

**D.    The Defendants' Fraudulent Treatment and Billing Protocol**

206.    Virtually all of the Insureds in the claims identified in Exhibits "1" – "8" whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

207.    Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a predetermined,

fraudulent protocol designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

208. The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

209. Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

210. No legitimate licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

211. The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent scheme, and because the Provider Defendants were not truly owned or controlled by the Nominal Owner Defendants, or any other licensed healthcare providers.

212. Rather, the Provider Defendants were illegally owned and controlled by the Management Defendants, who were not licensed in any healthcare professions and whose focus was profit, not patient care.

1.     **The Fraudulent Charges for Initial Examinations at Strategic Medical and Alford Smith P.C.**

213. As a first step in the Defendants' fraudulent treatment and billing protocol, the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic

Medical, and Alford Smith P.C. purported to provide virtually every Insured in the claims identified in Exhibits "1" and "2" with an initial examination, which purportedly was provided at either the Flatbush Clinic or one of the other Clinics pursuant to the kickbacks that the Management Defendants paid to the individuals and entities that owned and controlled those Clinics.

214. The initial examinations were performed as a "gateway" in order to provide Insureds with pre-determined, phony "diagnoses" to allow the Defendants to then provide the additional Fraudulent Services, including follow-up examinations, pain management injections, dry-needling, physical therapy services, chiropractic, and acupuncture.

215. Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, or Okoyechira purported to personally perform virtually all of the initial examinations in the claims identified in Exhibits "1" and "2".

216. The Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. then virtually always billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge of $105.63 for each initial examination they purported to perform and/or provide.

217. The charges for the initial examinations were fraudulent in that they misrepresented Strategic Medical and Alford Smith P.C.'s eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, Strategic Medical and Alford Smith P.C. never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

218.    The charges for the initial examinations also were fraudulent in that the initial examinations were medically unnecessary and were performed—to the extent that they were performed at all—pursuant to predetermined fraudulent treatment protocols and the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds.

219.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

**a.    The Fraudulent Misrepresentations of the Time Spent on the Initial Examinations**

220.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination typically represents that the physician, nurse practitioner, or physician assistant who performed the examination spent at least 30 minutes of face-to-face time with the Insured or the Insured's family during the examination.

221.    Though the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. virtually always billed for their putative initial examinations in the claims identified in Exhibits "1" and "2" under CPT code 99203, neither Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, nor any other physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C., ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

222.    In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. used boilerplate checklist forms in documenting the initial examinations, setting forth a very limited range of potential patient

complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

223.     All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

224.     These interviews and examinations did not require any physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C. to spend more than 10-15 minutes of face-to-face time with the Insureds, let alone 30 minutes.

225.     What is more – and in keeping with the fact that Strategic Medical and Alford Smith P.C. were unlawfully owned and controlled by the Management Defendants –Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. utilized the same boilerplate checklist examination forms that were used by Parisien, Lacina, and Monroe at the previous fraudulently-incorporated medical practices that had operated from the Flatbush Clinic under the control of the Management Defendants.

226.     In the claims for initial examinations identified in Exhibits "1" and "2", the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. routinely falsely represented that the examinations involved 30 minutes of face-to-face time between the examining healthcare providers and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99203, because examinations billable under CPT codes 99203 are reimbursable at higher rates than examinations that require less time to perform.

**b.     The Fraudulent Misrepresentations Regarding the Performance of "Detailed" Physical Examinations**

227.    In addition, pursuant to the Fee Schedule, when the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. submitted their charges for initial examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a physician, nurse practitioner, or physician assistant associated with Strategic Medical or Alford Smith P.C. conducted a "detailed" physical examination.

228.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the examining physician conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

229.    To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any actual complaints at all as the result of their generally minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

230.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, in the context of patient examinations, a physician, physician assistant, or nurse practitioner has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician, physician assistant, or nurse practitioner has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

231.    In the claims identified in Exhibits "1" and "2", when the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. billed for the initial examinations under CPT code 99203, they falsely represented that they provided "detailed" physical examinations to the Insureds they purported to treat during the initial examinations.

232.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", neither Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, nor any other physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C., ever conducted an extended examination of the Insureds' musculoskeletal systems.

233.    Specifically, in the claims for initial examinations identified in Exhibits "1" and "2", neither Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, nor any other physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C., ever documented findings with respect to:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

234.    In the claims for initial examinations 99203 that are identified in Exhibits "1" and "2", the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide "detailed" physical examinations.

**c.   The Fraudulent Misrepresentations Regarding "Low Complexity" Medical Decision-Making**

235.   Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor who performed the examination engaged in medical decision-making of "low complexity".

236.   Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

237.   The CPT Assistant provides various clinical examples of the types of presenting problems that require the kind of low complexity medical decision-making necessary to support a charge under CPT code 99203, specifically:

(i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)  Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

238.   Thus, pursuant to the CPT Assistant, the sort of presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either

chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

239. By contrast, to the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were garden-variety soft tissue injuries such as sprains and strains, which either had completely resolved or were in the process of resolving at the time of the purported initial examinations.

240. Though the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. routinely falsely represented that their initial examinations involved medical decision-making of "low complexity" when billed under CPT code 99203, in actuality the initial examinations did not involve any medical decision-making at all.

241. First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to Strategic Medical and Alford Smith P.C. for "treatment" pursuant to the Defendants' illegal kickback scheme, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. neither requested any medical records from any other providers, nor conducted any diagnostic tests.

242. Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

243.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

244.     In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

245.     Third, neither Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, nor any other physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C., ever considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

246.     Rather, to the extent that the initial examinations were conducted in the first instance, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira provided a nearly identical, pre-determined set of "diagnoses" for the Insureds, and prescribed a substantially similar course of treatment for each Insured.

247.     Specifically, in almost every instance, during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

248.     Even so, the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. prepared phony initial examination reports in which they provided boilerplate back sprain/strain to virtually every Insured.

249.     There are a substantial number of variables that can affect whether, how, and to

what extent an individual is injured in a given automobile accident.

250.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

251.   As set forth above, in the claims identified in Exhibits "1" and "2", virtually all of the Insureds whom Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

252.   It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

253.   It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Strategic Medical or Alford Smith P.C. with substantially identical injuries on the exact same dates weeks, or even months, after their accidents.

254.   Even so, in keeping with the fact that the Defendants' putative "diagnoses" were phony, in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, and in keeping with the fact that many of the Defendants' initial examinations were provided pursuant to the kickbacks that the Management Defendants paid to the Clinics, rather than medical necessity, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira – at the direction of the Management Defendants – frequently issued substantially identical phony "diagnoses", on the same date, to more than one Insured involved in a single

accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

255.   For example:

(i)   On May 12, 2018, two Insureds – CC and TL – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 E 180th Street, Bronx New York, CC and TL presented – incredibly – <u>on the exact same date</u>, June 7, 2018, to Strategic Medical and Etufugh-Nwankpa for an initial examination. CC and TL were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that CC and TL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Etufugh-Nwankpa – at the direction of the Management Defendants – provided CC and TL with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)   On May 21, 2018, two Insureds – PA and PD – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the Runners and referrals from personal injury attorneys, PA and PD presented to the Flatbush Clinic – incredibly – <u>on the exact same date</u>, June 5, 2018, to Strategic Medical and Okoyechira for an initial examination. PA and PD were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that PA and PD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Okoyechira – at the direction of the Management Defendants – provided PA and PD with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)   On July 23, 2018, two Insureds – JE and RR – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 95 East Merrick Road, Valley Stream, New York, JE and RR presented – incredibly – <u>on the exact same date more than a month later</u>, September 5, 2018, to Strategic Medical for an initial examination. JE and RR were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that JE and RR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical – at the direction of the Management Defendants – provided JE and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)     On July 26, 2018, two Insureds – MF and LT – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 E 180th Street, Bronx New York, MF and LT presented – incredibly – on the exact same date, August 20, 2018, to Strategic Medical and Etufugh-Nwankpa for an initial examination. MF and LT were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that MF and LT suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Etufugh-Nwankpa – at the direction of the Management Defendants – provided MF and LT with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)      On July 30, 2018, two Insureds – AB and JR – were involved in the same minor automobile accident. Thereafter, AB and JR presented – incredibly – on the exact same date, July 31, 2018, to Strategic Medical and Smith for an initial examination. AB and JR were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that AB and JR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Smith – at the direction of the Management Defendants – provided AB and JR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)     On August 3, 2018, two Insureds – MA and BP – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 E 180th Street, Bronx New York, MA and BP presented – incredibly – on the exact same date, August 9, 2018, to Strategic Medical and Jean-Baptiste for an initial examination. MA and BP were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that MA and BP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Jean-Baptiste – at the direction of the Management Defendants – provided MA and BP with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)    On August 9, 2018, three Insureds – DB and AD – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 2363 Ralph Avenue, Brooklyn New York, DB and AD presented on the exact same date, August 13, 2018, to Strategic Medical and Jean-Baptiste for an initial examination. DB and AD were different ages, in different physical conditions, and experienced the minor impact

from different locations in the vehicle. To the extent that DB and AD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Jean-Baptiste – at the direction of the Management Defendants – provided DB and AD with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)   On August 24, 2018, two Insureds – AB and YB – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the Runners and referrals from personal injury attorneys, AB and YB presented to the Flatbush Clinic – incredibly – on the exact same date, August 31, 2018, to Strategic Medical and Okoyechira for an initial examination. AB and YB were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that AB and YB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Okoyechira – at the direction of the Management Defendants – provided AB and YB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)   On August 30, 2018, two Insureds – DB and AG – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 95 East Merrick Road, Valley Stream, New York, DB and AG presented – incredibly – on the exact same date, September 5, 2018, to Strategic Medical for an initial examination. DB and AG were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that DB and AG suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical – at the direction of the Management Defendants – provided DB and AG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)   On September 29, 2018, three Insureds – TB, MJ, and DL – were involved in the same minor automobile accident. Thereafter, TB, MJ, and DL presented– incredibly – on the exact same date, October 1, 2018, to Strategic Medical and Jean-Baptiste for an initial examination. TB, MJ, and DL were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that TB, MJ, and DL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Jean-Baptiste – at the direction of the Management Defendants – provided TB, MJ, and DL with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)  October 9, 2018, two Insureds – TB and RF – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 E 180th Street, Bronx New York, TB and RF presented – incredibly – on the exact same date, December 27, 2018, to Alford Smith P.C. and Etufugh-Nwankpa for an initial examination. TB and RF were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that TB and RF suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Alford Smith P.C. and Etufugh-Nwankpa – at the direction of the Management Defendants – provided TB and RF with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)  On December 3, 2018, two Insureds – LD and JB – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 E 180th Street, Bronx New York, LD and JB presented – incredibly – on the exact same date, December 27, 2018, to Alford Smith P.C. and Etufugh-Nwankpa for an initial examination. LD and JB were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that LD and JB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Alford Smith P.C. and Etufugh-Nwankpa – at the direction of the Management Defendants – provided LD and JB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiii)  On December 6, 2018, two Insureds – TD and MM – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3041 Avenue U, Bronx, New York, TD and MM presented – incredibly – on the exact same date, December 12, 2018, to Alford Smith P.C. and Jen for an initial examination. TD and MM were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that TD and MM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Alford Smith P.C. and Jen – at the direction of the Management Defendants – provided TD and MM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiv)  On March 1, 2019, two Insureds – AA and DB – were involved in the same minor automobile accident. Thereafter, AA and DB presented – incredibly – on the exact same date, March 5, 2019, to Strategic Medical and Smith for an initial examination. AA and DB were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the

extent that AA and DB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Smith – at the direction of the Management Defendants – provided AA and DB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xv)    On March 11, 2019, two Insureds – CA and GV – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3041 Avenue U, Bronx, New York, CA and GV presented – incredibly – on the exact same date, March 11, 2018, to Strategic Medical and Okoyechira for an initial examination. CA and GV were different ages, in different physical conditions, and experienced the minor impact from different locations in the vehicle. To the extent that CA and GV suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Strategic Medical and Okoyechira – at the direction of the Management Defendants – provided CA and GV with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

256.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" and "2", Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira – at the direction of the Management Defendants –frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

257.    Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

258.    In the claims for initial examinations identified in Exhibits "1" and "2", the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic

Medical, and Alford Smith P.C. routinely falsely represented that the initial examinations involved "low complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

## 2. The Fraudulent Charges for Follow-Up Examinations

259.     In addition to the fraudulent initial examinations, the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment protocol.

260.     Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, or Okoyechira purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibits "1" and "2".

261.     The Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. then virtually always billed the follow-up examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99213, typically resulting in a charge of $70.36 for each follow-up examination they purported to perform and/or provide.

262.     The charges for the follow-up examinations were fraudulent in that they misrepresented Strategic Medical and Alford Smith P.C.'s eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, Strategic Medical and Alford Smith P.C. never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

263.    The charges for the follow-up examinations also were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to fraudulent predetermined treatment protocols and the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds.

264.    Furthermore, the charges for the follow-up examinations were fraudulent in that they misrepresented the extent, nature, and results of the follow-up examinations.

265.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the Insured presented with problems of low-to-moderate severity.

266.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low-to-moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination. Specifically:

(i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

267.    Accordingly, pursuant to the CPT Assistant, even the low-to-moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

268.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

269.    For instance, and as set forth above, in virtually every case the Insureds who presented to the Provider Defendants for treatment were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

270.    To the limited extent that the Insureds were treated at any hospital following their accidents, they virtually always briefly were observed on an outpatient basis and then sent on their way after an hour or two with – at most – a minor sprain or strain diagnosis.

271.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all.

272.    Accordingly, by the time the Insureds in the claims identified in Exhibits "1" and "2" presented to Strategic Medical or Alford Smith P.C. for follow-up examinations – typically weeks or months after their minor accidents – they either had no continuing injuries at all as the result of their minor accidents, or their presenting problems were minimal.

273.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. falsely represented that the Insureds presented with problems of low-to-moderate severity (when billed under CPT code 99213) in order to create a false basis for

their charges under CPT code 99213, because follow-up examinations billable under CPT codes 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

274.    In the claims for follow-up examinations identified in Exhibits "1" and "2", the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. also falsely represented that the Insureds presented with problems of low-to-moderate severity  in order to create the false appearance that the Insureds continued to suffer from injuries sustained in automobile accidents, and thereby create a false basis for the other Fraudulent Services the Defendants purported to provide, including medically-unnecessary "dry needling" injections, physical therapy, chiropractic, and acupuncture.

275.    What is more, and pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up patient examination typically requires that the examining physician, nurse practitioner, or physician assistant spend at least 15 minutes of face-to-face time with the Insured or the Insured's family during the examination.

276.    Though the Management Defendants, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. billed for their putative follow-up examinations using CPT code 99213, neither Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, nor any other physician, physician assistant, or nurse practitioner associated with Strategic Medical or Alford Smith P.C., ever spent 15 minutes of face-to-face time with the Insureds or their families in the follow-up examinations identified in Exhibits "1" and "2".

277.    Rather, the follow-up examinations in the claims identified in Exhibits "1" and "2" rarely lasted more than five minutes, to the extent that they were conducted at all.

278.    In keeping with the fact that the follow-up examinations in the claims identified in Exhibits "1" and "2" rarely lasted more than five minutes, to the extent that they were conducted at all, Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. used boilerplate checklist forms in documenting the follow-up examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

279.    All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

280.    These interviews and examinations did not require any physician or nurse practitioner associated with the Provider Defendants to spend more than five minutes of face-to-face time with the Insureds or their families, let alone 15 minutes.

281.    What is more – and in keeping with the fact that Strategic Medical and Alford Smith P.C. were unlawfully owned and controlled by the Management Defendants –Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, Okoyechira, Strategic Medical, and Alford Smith P.C. utilized the same boilerplate checklist examination forms that were used by Parisien, Lacina, and Monroe at the previous fraudulently-incorporated medical practices that had operated from the Flatbush Clinic under the control of the Management Defendants.

282.    In the claims for follow-up examinations identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the examinations involved 15 minutes of face-to-face time between the examining physicians and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99213, because follow-up

examinations billable under CPT codes 99213 are reimbursable at higher rates than examinations that require less time to perform.

283. Furthermore, pursuant to the Fee Schedule, when the Defendants billed for their putative follow-up examinations under CPT code 99213, they represented that Smith, Jean-Baptiste, Etufugh-Nwankpa, Jen, or Okoyechira performed at least two of the following three components during the putative follow-up examinations: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

284. In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" and "2", neither Smith, nor any treating physicians, physician assistants, and nurse practitioners associated with the Provider Defendants took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

285. Rather, following their purported follow-up examinations, and at the direction of the Management Defendants, Smith and the other treating physicians, physician assistants, and nurse practitioners simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) referred the Insureds back to the Provider Defendants for medically-unnecessary trigger point and/or "dry needling" injections.

286. As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

287. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

288.    What is more, even in the unlikely event that two Insureds suffered substantially identical injuries in a single automobile accident, their individual characteristics would determine whether, how, and to what extent their respective injuries resolved over time.

289.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations many weeks or even months after the underlying accidents.

290.    It is even more improbable – to the point of impossibility – that this would happen over and over again.

291.    Even so, in keeping with the fact that the Defendants' putative follow-up examinations were phony, Smith and the other treating physicians, physician assistants, and nurse practitioners – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

292.    For example:

(i)     On May 12, 2018, two Insureds – CC and TL – were involved in the same minor automobile accident. CC and TF were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that CC and TF suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of CC and TF at Strategic Medical on July 12, 2018, Jean-Baptiste – at the direction of the Management Defendants – provided CFC and TF with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(ii)    On May 20, 2018, two Insureds – MBl and FP – were involved in the same minor automobile accident. MB and FP were different ages, in different physical

condition, and experienced the minor impact from different locations in the vehicle. To the extent that MB and FP suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of MB and FP at Strategic Medical on July 17, 2018, Jean-Baptiste – at the direction of the Management Defendants – provided MB and FP with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(iii) On May 21, 2018, two Insureds – PA and PD – were involved in the same minor automobile accident. PA and PD were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that PA and PD suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of PA and PD at Strategic Medical on August 6, 2018, Jean-Baptiste – at the direction of the Management Defendants – provided PA and PD with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(iv) On July 30, 2018, two Insureds – AC and JR – were involved in the same minor automobile accident. AC and JR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AC and JR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of AC and JR at Strategic Medical on September 27, 2018, Jen – at the direction of the Management Defendants – provided AC and JR with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(v) On October 15, 2018, two Insureds – TB and RF – were involved in the same minor automobile accident. TB and RF were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that TB and RF suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of TB and RF at Alford Smith P.C. on January 17, 2019, Etufugh-Nwankpa – at the direction of the Management Defendants – provided TB and RF with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(vi) On October 16, 2018, two Insureds – ET and ET – were involved in the same minor automobile accident. ET and ET were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that ET and ET suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of ET and ET at Alford Smith P.C. on December 27, 2018, Etufugh-Nwankpa – at the direction of the Management Defendants – provided ET and ET with substantially identical,

phony "diagnoses", despite the fact that they were differently situated.

(vii)  On October 16, 2018, two Insureds – ET and ET – were involved in the same minor automobile accident. ET and ET were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that ET and ET suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of ET and ET at Strategic Medical on April 11, 2019, Etufugh-Nwankpa – at the direction of the Management Defendants – provided ET and ET with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(viii)  On September 29, 2018, two Insureds – TB and DL – were involved in the same minor automobile accident. TB and DL were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that TB and DL suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of TB and DL at Alford Smith P.C. on January 9, 2019, Etufugh-Nwankpa – at the direction of the Management Defendants – provided TB and DL with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

293.  These are only representative examples. In the claims for follow-up examinations that are identified in Exhibits "1" and "2", Smith and the other treating physicians, physician assistants, and nurse practitioners – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

294.  Smith and the other treating physicians, physician assistants, and nurse practitioners routinely inserted these false "diagnoses" in their follow-up examination reports in order to create the false impression that the follow-up examinations actually were legitimately performed, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

### 3.    The Fraudulent Charges for Dry-Needling

295.    Based upon the fraudulent, pre-determined, and phony "diagnoses" that Smith and the other treating physicians, physician assistants, and nurse practitioners provided during their ersatz initial and follow-up examinations, the Defendants purported to subject many Insureds in the claims identified in Exhibits "1" and "2" to a series of medically unnecessary "dry needling" injections.

296.    The Defendants purported to perform and/or provide their putative dry needling injections in order to treat trigger points in the Insureds, although the Insureds in the claims identified in Exhibits "1" and "2" did not have any legitimate trigger point complaints, and did not require any trigger point treatments.

297.    Smith and the other treating physicians, physician assistants, and nurse practitioners virtually always purported to personally administer the dry needling injections, which the Defendants then billed through the Provider Defendants to GEICO as multiple charges of either $100.00, $75.00, or $50.00 per Insured, per date of service, under CPT code 20999, typically resulting in charges of thousands of dollars per Insured, per date of service, for each set of dry needling injections the Defendants purported to perform and/or provide.

298.    Like the Defendants' charges for the other Fraudulent Services, the charges for the dry needling injections were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

299. The charges for the dry needling injections also were fraudulent in that the dry needling injections were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent predetermined treatment protocol and the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**a.    Legitimate Use of Dry Needling Injections**

300. Dry needling is a technique in which a thin filiform needle is used to penetrate the skin and stimulate underlying myofascial trigger points, muscular, and connective tissues. The technique is used to treat dysfunctions in skeletal muscle, fascia, and connective tissue, diminish persistent peripheral nociceptive input, and reduce or restore impairments of body structure and function.

301. As set forth above, any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

302. In a legitimate clinical setting, dry needling injections – like any other type of pain management injections – should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

303. This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of days or weeks through conservative treatment, and invasive dry needling injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

304.    Moreover, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections – including trigger point injections and dry needling injections – should not be administered simultaneously.

305.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.      The Defendants' Medically Unnecessary Dry Needling Injections**

306.    However, in the claims for dry needling injections that are identified in Exhibits "1" and "2", Smith and the other treating physicians, physician assistants, and nurse practitioners – at the direction of the Management Defendants – routinely purported to subject Insureds to a massive amount of dry needling injections within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

307.    What is more, in the claims for dry needling injections that are identified in Exhibits "1" and "2", Smith and the other treating physicians, physician assistants, and nurse practitioners – at the direction of the Management Defendants – often purported to administer dry needling injections to Insureds prior to determining whether the Insured experienced persistent pain symptoms or failed conservative treatments.

308.    For example:

(i)      On June 1, 2018, an Insured named RG was involved in an automobile accident. Though RG could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to RG on June 7, 2018, less than a week after the accident.

(ii)     On June 3, 2018, an Insured named BO was involved in an automobile accident. Though BO could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jean-Baptiste and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to BO on June 6, 2018, three days after the accident.

(iii)    On July 17, 2018, an Insured named MR was involved in an automobile accident. Though MR could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to RI on July 19, 2018, two days after the accident.

(iv)    On July 18, 2018, an Insured named LJ was involved in an automobile accident. Though LJ could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jean-Baptiste and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to LJ on July 23, 2018, less than a week after the accident.

(v)     On July 20, 2018, an Insured named RB was involved in an automobile accident. Though RB could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to RB on July 26, 2018, less than a week after the accident.

(vi)    On July 24, 2018, an Insured named JS was involved in an automobile accident. Though JS could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to JS on July 30, 2018, less than a week after the accident.

(vii)   On July 27, 2018, an Insured named DK was involved in an automobile accident. Though DK could not have experienced persistent pain symptoms or failed

conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to DK on August 2, 2018, less than a week after the accident.

(viii)   On July 27, 2018, an Insured named FH was involved in an automobile accident. Though FH could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to FH on August 2, 2018, less than a week after the accident.

(ix)   On July 30, 2018, an Insured named SW was involved in an automobile accident. Though SW could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jean-Baptiste and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to SW on August 2, 2018, three days after the accident.

(x)   On August 3, 2018, an Insured named MA was involved in an automobile accident. Though MA could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jean-Baptiste and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to DK on August 9, 2018, less than a week after the accident.

(xi)   On August 3, 2018, an Insured named BP was involved in an automobile accident. Though BP could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jean-Baptiste and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to BP on August 9, 2018, less than a week after the accident.

(xii)   On August 11, 2018, an Insured named SA was involved in an automobile accident. Though SA could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to SA on August 15, 2018, four days after the accident.

(xiii)   On September 30, 2018, an Insured named JF was involved in an automobile accident. Though JF could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Strategic Medical – at the direction of the Management Defendants –purported to administer more than a dozen dry needling injections to JF on October 4, 2018, four days after the accident.

(xiv)   On October 13, 2018, an Insured named LD was involved in an automobile accident. Though LD could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to LD on October 18, 2018, less than a week after the accident.

(xv)    On October 29, 2018, an Insured named SC was involved in an automobile accident. Though SC could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to SC on October 31, 2018, two days after the accident.

(xvi)   On November 19, 2018, an Insured named KC was involved in an automobile accident. Though KC could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Alford Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to KC on November 21, 2018, two days after the accident.

(xvii)  On November 30, 2018, an Insured named MG was involved in an automobile accident. Though MG could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Alford Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to MG on December 6, 2018, less than a week after the accident.

(xviii) On December 6, 2018, an Insured named TD was involved in an automobile accident. Though TD could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Alford Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to TD on December 12, 2018, less than a week after the accident.

(xix)   On December 6, 2018, an Insured named JD was involved in an automobile accident. Though JD could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Alford Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to JD on December 12, 2018, less than a week after the accident.

(xx)    On December 6, 2018, an Insured named MM was involved in an automobile accident. Though MM could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Alford

Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to MM on December 12, 2018, less than a week after the accident.

(xxi) On January 4, 2019, an Insured named JM was involved in an automobile accident. Though JM could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Alford Smith P.C. – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to JM on January 10, 2019, less than a week after the accident.

(xxii) On February 15, 2019, an Insured named SL was involved in an automobile accident. Though SL could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Jen and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to SL on February 20, 2019 less than a week after the accident.

(xxiii) On March 22, 2019, an Insured named AJ was involved in an automobile accident. Though AJ could not have experienced persistent pain symptoms or failed conservative treatments less than a week after the accident, Etufugh-Nwankpa and Strategic Medical – at the direction of the Management Defendants – purported to administer more than a dozen dry needling injections to AJ on March 28, 2019, less than a week after the accident.

309. These are only representative examples. In the dry needling injection claims identified in Exhibits "1" and "2", the Defendants routinely purported to perform and/or provide medically unnecessary dry needling to Insureds within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

310. The Defendants engaged in this conduct solely in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to the injections.

311. The Defendants purported to perform and/or provide these medically unnecessary dry needling injections because their focus was on generating profit, rather than on patient case,

and because the Provider Defendants were operated pursuant to the pecuniary interests of the Management Defendants, rather than the legitimate medical judgment of true doctor-owners.

**3.     The Fraudulent Charges for Electrodiagnostic Testing**

312.    As set forth in Exhibit "1" based upon the fraudulent, predetermined "diagnoses" provided during the initial examinations, the Defendants purported to subject many Insureds to a series of medically unnecessary, useless, and illusory electrodiagnostic ("EDX") tests, including nerve conduction velocity ("NCV") tests, and electromyography ("EMG") tests.

313.    Typically, Smith purported to perform the EDX tests, which then were billed to GEICO through Strategic Medical.

314.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' fraudulent treatment protocol and the kickbacks that the Management Defendants paid at the Clinics, not to treat or otherwise benefit the Insureds.

**a.     The Human Nervous System and Electrodiagnostic Testing**

315.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

316.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

317.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

318.     Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

319.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

320.     EMGs and NCVs are forms of EDX tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

321.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

322.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

323.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

324.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

325.    According to the Recommended Policy, both NCV tests and EMG tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

**b.    The Fraudulent Billing for Illusory EMG Tests**

326.    EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

327.    Though Smith and Strategic Medical purported to provide and bill for EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, Smith and Strategic Medical never actually provided a single EMG to a single Insured.

328.    At the EUO conducted of Strategic Medical, Smith affirmatively stated that Strategic Medical had never performed EMGs.

78

329. In keeping with the Management Defendants' complete control over Strategic Medical's operations, Smith was unaware that, at the time of the EUO, the Management Defendants were using Strategic Medical to submit numerous bills to GEICO for EMGs purportedly performed by Smith.

330. In many instances the Managements Defendants, Smith, and Strategic Medical submitted billing to GEICO for NCVs, or caused such billing to be submitted, where no EMGs were even alleged to have been performed, making the test results medically useless in the diagnosis and treatment of an Insured.

331. In many other cases, the Managements Defendants, Smith, and Strategic Medical submitted billing to GEICO, or caused billing to be submitted to GEICO, which falsely represented that NCVs and EMGs were performed together on the same patient at the same time, despite the fact that Smith under oath at his January 2019 EUO testified that Strategic Medical had not performed any EMGs.

332. For example, in the claims identified in Exhibit "1", the Defendants falsely represented that Smith and Strategic Medical provided EMGs to the following Insureds, when in fact, Smith and Strategic Medical had never performed a single EMG test on any Insured:

    (i)     CS

    (ii)    PD

    (iii)   CJ

    (iv)   SF

    (v)    DB

    (vi)   WP

    (vii)  AC

(viii)   DF

(ix)    AB

(x)     CB

(xi)    KS

(xii)   CM

(xiii)  JA

(xiv)   WC

(xv)    FG

(xvi)   PS

(xvii)  YB

(xviii) JR

(xix)   JL

(xx)    TM

(xxi)   AM

(xxii)  KK

(xxiii) DD

(xxiv)  DL

(xxv)   TB

(xxvi)  JF

## c.    The Fraudulent NCV Tests

333.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the

surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

334.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

335.    In order to be clinically useful in the diagnoses of peripheral nervous system disorders, NCVs and EMGs must be performed together.

336.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

337.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

338.    As set forth above, in many instances, the Managements Defendants, Smith, and Strategic Medical submitted billing to GEICO for NCVs – or caused such billing to be submitted – despite the fact that no corresponding EMGs had been performed, making the tests useless in the diagnosis and treatment of the Insureds.

339. In many other cases, the Managements Defendants, Smith, and Strategic Medical submitted billing to GEICO, or caused billing to be submitted, which falsely represented that NCVs and EMGs were performed together on the same patient at the same time, despite the fact that Smith under oath at his January 2019 EUO testified that Strategic Medical had not performed any EMGs.

340. In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Smith and Strategic – at the direction of the Management Defendants – routinely purported to test far more nerves than recommended by the Recommended Policy.

341. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of 8 motor nerves; (ii) NCV tests of 10 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies.

342. For example, in the claims identified in Exhibit "1", the Defendants purported to provide this massive, medically unnecessary amount of NCV tests to – among many others – the following Insureds:

(i)     PA;

(ii)    JA;

(iii)   YB;

(iv)    AB;

(v)     DB;

(vi)    WC;

(vii)   TD;

(viii)  PD;

(ix)     SF;

(x)      DF;

(xi)     TH;

(xii)    CJ;

(xiii)   KK;

(xiv)    JL;

(xv)     TM;

(xvi)    AM;

(xvii)   WP;

(xviii)  MR;

(xix)    CS;

(xx)     JS;

(xxi)    PS; and

(xxii)   TS

343.    The Management Defendants were concerned that the massive, medically unnecessary number of NCV tests they were causing Smith and Strategic Medical to purport to provide would draw attention to their fraudulent scheme.

344.    Accordingly, the Management Defendants, Smith, and Strategic Medical acted to conceal the number of NCV tests they provided to any individual Insured, by purporting to provide the tests on multiple days and splitting the billing for the NCV tests into two separate bills for each individual Insured.

345.    Other than to conceal the massive number of NCV tests they purported to provide to each individual Insured, there was no reason why the Management Defendants, Smith, and

Strategic Medical would perform the NCV tests on multiple days and split the billing for the NCV tests into two separate bills for each individual Insured.

346.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

347.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

348.    This concept is emphasized in the Recommended Policy, which states that:
EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

349.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

350.    Smith and Strategic Medical did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

351.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibit "1".

352.    In particular, Smith and Strategic Medical purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually all of the NCV test claims identified in Exhibit "1":

(i)      left and right median motor nerves;

(ii)     left and right ulnar motor nerves;

(iii)    left and right peroneal motor nerves;

(iv)    left and right tibial motor nerves;

(v)     left and right median sensory nerves;

(vi)    left and right radial sensory nerves;

(vii)   left and right ulnar sensory nerves.

(viii)  left and right superficial peroneal sensory nerves; and

(ix)    left and right sural sensory nerves;

353.    The cookie-cutter approach to the NCV tests that Smith and Strategic purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

354.    Assuming that all other conditions of coverage are satisfied, the NY Fee Schedule permitted lawfully licensed healthcare providers in the New York metropolitan area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test was performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which an NCV test was performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that was performed on the nerves of any limb.

355.    Smith and Strategic Medical – at the direction of the Management Defendants – purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the NCV tests were medically necessary.

## 6.    The Fraudulent Charges for Acupuncture

356.    In addition to the other Fraudulent Services, the Defendants routinely subjected Insureds to a course of medically unnecessary acupuncture services.

357.    The Defendants submitted or caused to be submitted bills for these acupuncture services through Kings Acupuncture and Zhou Acupuncture.

358.    Deng purported to provide all of the acupuncture services on behalf of Kings Acupuncture to the Insureds in Exhibit "7".

359.    Zhou purported to provide all of the acupuncture services on behalf of Zhou Acupuncture to the Insureds in Exhibit "8".

360.    Like the Defendants' charges for the other Fraudulent Services, the charges for acupuncture services were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the illegal kickback arrangement and Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits. This predetermined, fraudulent protocol was grounded on boilerplate examinations and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

361.    Pursuant to the Defendants' fraudulent predetermined treatment and billing protocol, virtually every insured was referred to Deng and Kings Acupuncture or Zhou and Zhou

Acupuncture for a course of acupuncture services that involved an identical treatment plan consisting of the same acupuncture services being rendered 3 times per week for months.

a.      **Legitimate Acupuncture Practices**

362.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Qi" or "Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

363.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

364.    The first step in any legitimate acupuncture treatment is a physical examination of the patient which is comprised of three components: (1) palpation of the areas of complaint; (2) an assessment of the patient's functionality (i.e., range of motion, ability to perform activities of daily living, etc.); and (3) an assessment of the patient's energy system which includes an examination of the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.).

365.    In cases involving trauma, a physical examination is appropriate to identify the location of the injury and the consequent pain and, by extension, to identify Meridians, if any, that have been disrupted.  Examination of the appearance of the patient's tongue and various measurements of the patient's pulse assist with the diagnosis of the patient's condition and

thereby helps develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.

366.    The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

367.    In developing a legitimate acupuncture treatment plan, an acupuncturist must choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

368.    The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan.   If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between 5 and 10 Acupuncture Points for a minimum of 20 minutes. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

369.    As part of a legitimate acupuncture treatment plan, the weekly treatment sessions typically should decrease the first two weeks, leaving more time between treatments to assess

how long the patient remains pain-free between treatments and/or how long the therapeutic effect of such treatments can be maintained between treatments.

370.    Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

371.    Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

**b.    The Defendants' Fraudulent Initial Acupuncture Examinations**

372.    Deng, Kings Acupuncture, Zhou, and Zhou Acupuncture (collectively the "Acupuncture Defendants") – at the direction of the Management Defendants – routinely purported to begin their treatment of Insureds with an initial acupuncture examination which was billed under CPT code 99203 resulting in a charge of $54.73.

373.    The charges for the initial examinations were fraudulent in that they misrepresented the Acupuncture Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, Kings Acupuncture and Zhou Acupuncture never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

374.    Furthermore, the Acupuncture Defendants' charges for the initial acupuncture examinations were fraudulent in that they misrepresented the extent of the examinations.

375.     The use of CPT code 99203 typically requires that the examining acupuncturist spend 30 minutes of face-to-face time with the Insured or the Insured's family.

376.     Though the Acupuncture Defendants virtually always billed for their putative initial examinations in the claims identified in Exhibits "7" and "8" under CPT code 99203, neither Deng, Zhou, nor any other acupuncturist associated with the Acupuncture Defendants, ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

377.     In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, the Acupuncture Defendants used template forms in conducting the examinations which consisted primarily of boilerplate language and pre-printed checklists.

378.     The pre-printed checklist and template forms that Acupuncture Defendants used in conducting the initial acupuncture examinations set forth a very limited range of potential patient complaints, potential diagnoses, and treatment recommendations and did not document any objective clinical findings.

379.     The pre-printed checklist and template forms that the Acupuncture Defendants used do not reflect any genuine examination of the Insureds and contain purported findings that were, at best, a reiteration of the Insureds' alleged subjective complaints.

380.     What is more, and in keeping with the fact that Kings Acupuncture and Zhou Acupuncture are both unlawfully owned and controlled by the Management Defendants—despite purporting to be independent acupuncture practices owned by different licensed acupuncturists—Kings Acupuncture and Zhou Acupuncture utilized the same exact boilerplate checklist forms. It is improbable, to the point of impossibility, that Deng and Zhou would coincidentally "just

happen" to use the exact same boilerplate checklist forms in purporting to perform and/or provide initial examinations.

381.    In the claims for initial examinations identified in Exhibits "7" and "8", the Defendants routinely falsely represented that the examinations involved 30 minutes of face-to-face time between the examining acupuncturist and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99203, because examinations billable under CPT codes 99203 are reimbursable at higher rates than examinations that require less time to perform.

**c.    The Acupuncture Defendants' Fraudulent Acupuncture Treatment**

382.    Following the fraudulent initial acupuncture examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO primarily under CPT codes 97810, 97811, and 97813 typically resulting in charges of between $30.00 and $54.73 per unit of acupuncture.

383.    The Acupuncture Defendants also purported to provide "cupping" treatments to virtually every Insured resulting in charges of $50.00 for each session.

384.    The purported acupuncture services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.

385.    All patients were treated with a small number of repetitive and virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.  As such, these acupuncture treatments were not medically necessary.  Indeed, they were designed solely to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

386. At best, the purported acupuncture services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insureds' conditions and were not designed to effectively treat or otherwise benefit the Insureds.

387. The services billed for by the Acupuncture Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

388. The predetermined fraudulent treatment protocol is further established by the fact that The Acupuncture Defendants routinely billed for one unit of acupuncture and one unit of cupping per treatment date per patient, instead of providing varying or individualized treatment that was aimed at legitimately treating the Insureds.

389. Furthermore, cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area. Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendants billed for cupping as a matter of course, without any evidence of need or effectiveness.

390. Through this fraudulent treatment and billing protocol, the Defendants substantially inflated the bills they submitted or caused to be submitted to GEICO for the purported acupuncture services.

391. The Acupuncture Defendants' boilerplate approach to the acupuncture treatments that they purportedly performed, or caused to be performed, on virtually every Insured was designed solely to maximize the charges that they could submit to GEICO and other insurers, and to maximize the Defendants' ill-gotten profits.

**7.     The Fraudulent Charges for Chiropractic and Physical Therapy**

392.    As part of the Defendants' fraudulent treatment protocol, Mollo, Energy Chiro, ACH Chiro, Buslon, MSB PT, and M Buslon PT (collectively, "Chiro-PT Defendants") purported to subject many Insureds to a series of medically unnecessary treatments, including chiropractic manipulation, ligament laxity testing, and temperature gradient studies.

393.    Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment and physical therapy treatment were fraudulent in that the services were performed – to the extent they were performed at all – pursuant to the illegal kickback arrangements and Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits. This predetermined, fraudulent protocol was grounded on boilerplate examinations and reports used to support excessive and medically unnecessary acupuncture services not warranted by the patients' conditions.

394.    Virtually none of the Insureds who presented to the Chiro-PT Defendants for treatment suffered any injuries at all as the result of the minor automobile accidents they purportedly experienced, much less any injuries requiring months of physical therapy or chiropractic services.

395.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

396.    Nonetheless, pursuant to the Defendants' fraudulent treatment and billing protocol, following their initial examination/consultations and follow-up examinations, virtually

every Insured was prescribed a medically unnecessary, extended course of physical therapy and chiropractic services.

**8.     The Fraudulent Billing for Services Provided by Independent Contractors**

397.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the healthcare providers themselves, or by their employees.

398.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act..."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the

CMS).

399. Smith was the only healthcare services provider employed by Strategic Medical or Alford Smith P.C.

400. Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen were not employed by Strategic Medical or Alford Smith P.C. – rather, they were independent contractors of Strategic Medical and Alford Smith, P.C.

401. Buslon was the only healthcare services provider employed by MSB PT or M Buslon PT.

402. Mollo was the only healthcare services provider employed by Energy Chiro or ACH Chiro.

403. Deng was the only healthcare services provider employed by Kings Acupuncture.

404. Zhou was the only healthcare services provider employed by Zhou Acupuncture.

405. Even so, the Defendants routinely submitted charges to GEICO and other insurers under the tax identification numbers of Strategic Medical, Alford Smith, P.C., MSB PT, M Buslon PT, Energy Chiro, ACH Chiro, Kings Acupuncture, and Zhou Acupuncture for Fraudulent Services that were provided – to the extent that they were provided at all – by professionals other than Smith, Buslon Mollo, Deng, or Zhou.

406. To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than Smith, Buslon Mollo, Deng, or Zhou – including but not limited to Fraudulent Services performed by Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen – were performed by physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals whom the Defendants treated as independent contractors.

407.    For instance, the Defendants:

(i)      paid the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals;

(v)     failed to withhold federal, state or city taxes on behalf of the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals;

(vi)    compelled the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals to pay for their own malpractice insurance at their own expense;

(vii)   permitted the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals to set their own schedules and days on which they desired to perform services;

(viii)  permitted the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals were independent contractors.

408.    By electing to treat the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals.

409.    Because the physicians, physician assistants, nurse practitioners, chiropractors, acupuncturists, physical therapists, or unlicensed individuals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

410.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

411.    In some cases, the Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Smith, Buslon, Mollo, Deng, or Zhou on the billing as the treating provider, or by falsely contending – in their billing for the Fraudulent Services – that the physicians, physician assistants, nurse practitioners,

chiropractors, acupuncturists, physical therapists, or unlicensed individuals were employees of the Provider Defendants.

## IV. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

412.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

413.   The NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in they were putative healthcare practices that illegally were owned and controlled by unlicensed individuals, and which illegally split fees with unlicensed individuals.

(iv)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were are in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in

compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

(v)     In many cases, the NF-3 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees

## V.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

414.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

415.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

416.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

417.    Additionally, the Defendants entered into complex financial arrangements with one another and with others that were designed to, and did, conceal that fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks in exchange for patient referrals.

418.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

419.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, nurse practitioners, physical therapists, and unlicensed individuals with the Provider Defendants in order to prevent GEICO from discovering that the physicians, nurse practitioners, physical therapists, and unlicensed individuals performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the Provider Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, or falsely claimed that the individuals providing the Fraudulent Services were employees of the Provider Defendants, in order to conceal the fact that the services were performed by independent contractors.

420.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

421.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.  Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

422.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault

claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

423.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

424.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

425.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $340,000.00 based upon the fraudulent charges.

426.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the Provider Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

427.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

428.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $1,000,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

429.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

430.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

431.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

432.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Defendants and others.

433.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

434.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants were fraudulently licensed, owned, and controlled by unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

435.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants unlawfully split fees with unlicensed individuals and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

436.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants have failed and/or refused to comply with GEICO's lawful requests for additional verification.

437.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Smith and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

438.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

439.    Strategic Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

440.    Smith, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Strategic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or

cause to be submitted thousands of fraudulent charges on a continuous basis for over a year seeking payments that Strategic Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Strategic Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

441. Strategic Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Smith and the Management Defendants operated Strategic Medical, inasmuch as Strategic Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Strategic Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Strategic Medical to the present day.

442.     Strategic Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Strategic Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Strategic Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

443.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted by the Defendants through Strategic Medical.

444.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen
### (Violation of RICO, 18 U.S.C. § 1962(d))

445.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

446.     Strategic Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

447.     Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen are employed by and/or associated with Strategic Medical.

448.     Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Strategic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over a year seeking payments that Strategic Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Strategic Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

449.     Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

450.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Strategic Medical.

451.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Strategic Medical, Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen**
**(Common Law Fraud)**

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

453.    Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

454.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Strategic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Strategic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Strategic Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal

kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by Strategic Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

455.    Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Strategic Medical that were not compensable under the No-Fault Laws.

456.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $61,000.00 pursuant to the fraudulent bills submitted by the Defendants through Strategic Medical.

457.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

458.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Strategic Medical, Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen**
**(Unjust Enrichment)**

459.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-426, above.

460.    As set forth above, Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

461.    When GEICO paid the bills and charges submitted by or on behalf of Strategic Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

462.    Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

463.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

464.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $61,816.96.

### SIXTH CAUSE OF ACTION
**Against Smith and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

465.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

466.    Alford Smith P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

467.    Smith, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Alford Smith P.C.'s

affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over eight months seeking payments that Alford Smith P.C. was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Alford Smith P.C. employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

468.    Alford Smith P.C.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Smith and the Management Defendants operated Alford Smith P.C., inasmuch as Alford Smith P.C. never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Alford Smith P.C. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants

continue to attempt collection on the fraudulent billing submitted through Alford Smith P.C. to the present day.

469.    Alford Smith P.C. is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Alford Smith P.C. likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Alford Smith P.C. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

470.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted by the Defendants through Alford Smith P.C..

471.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, and Jen (Violation of RICO, 18 U.S.C. § 1962(d))

472.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

473.    Alford Smith P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

474.    Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen are employed by and/or associated with Alford Smith P.C..

475.    Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Alford Smith P.C.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over eight months seeking payments that Alford Smith P.C. was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Alford Smith P.C. employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

476.    Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

477. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Alford Smith P.C..

478. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Alford Smith P.C., Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, and Jen
### (Common Law Fraud)

479. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

480. Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

481. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Alford Smith P.C. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Alford Smith P.C. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Alford Smith P.C. was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services

113

were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Smith, the representation that the billed-for services were performed by Alford Smith P.C.'s employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

482.    Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Alford Smith P.C. that were not compensable under the No-Fault Laws.

483.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $15,000.00 pursuant to the fraudulent bills submitted by the Defendants through Alford Smith P.C..

484.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

485.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Alford Smith P.C., Smith, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, and Jen**
**(Unjust Enrichment)**

486.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

487.    As set forth above, Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

488.    When GEICO paid the bills and charges submitted by or on behalf of Alford Smith P.C. for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

489.    Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

490.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

491.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $15,000.00.

## TENTH CAUSE OF ACTION
### Against Buslon and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

492.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

493.    MSB PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

494.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the MSB PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that MSB PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physical therapists; (ii) it engaged in fee-splitting with non-physical therapists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by MSB PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

495.    MSB PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Buslon and the Management Defendants operated MSB PT, inasmuch as MSB PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for MSB PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through MSB PT to the present day.

496.    MSB PT is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. MSB PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by MSB PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

497.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $38,000.00 pursuant to the fraudulent bills submitted by the Defendants through MSB PT.

498.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Buslon and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

499.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

500.    MSB PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

501.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with MSB PT.

502.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct

117

of the MSB PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that MSB PT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physical therapists; (ii) it engaged in fee-splitting with non-physical therapists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by MSB PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

503.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

504.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $38,000.00 pursuant to the fraudulent bills submitted by the Defendants through the MSB PT.

505.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against MSB PT, Buslon, and the Management Defendants
### (Common Law Fraud)

506.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

507.    MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

508.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MSB PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physical therapists; (ii) in every claim, the representation that MSB PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact MSB PT was not properly licensed in that it engaged in illegal fee-splitting with non- physical therapists and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed

by Buslon, the representation that the billed-for services were performed by MSB PT's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

509.    MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MSB PT that were not compensable under the No-Fault Laws.

510.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $38,000.00 pursuant to the fraudulent bills submitted by the Defendants through MSB PT.

511.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

512.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against MSB PT, Buslon, and the Management Defendants
### (Unjust Enrichment)

513.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

514.    As set forth above, MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

515.    When GEICO paid the bills and charges submitted by or on behalf of MSB PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

516.    MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

517.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

518.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $38,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Buslon and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

519.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

520.    M Buslon PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

521.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the M Buslon PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over ten months seeking payments that M Buslon PT was not eligible to receive under the No-Fault Laws

because: (i) it was unlawfully licensed, owned and controlled by non- physical therapists; (ii) it engaged in fee-splitting with non- physical therapists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by M Buslon PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

522.   M Buslon PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Buslon and the Management Defendants operated M Buslon PT, inasmuch as M Buslon PT never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for M Buslon PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through M Buslon PT to the present day.

523.   M Buslon PT is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. M Buslon PT likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing

submitted to GEICO and other insurers. These inherently unlawful acts are taken by M Buslon PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

524.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by the Defendants through M Buslon PT.

525.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Buslon, the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

526.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

527.   M Buslon PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

528.   Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with M Buslon PT.

529.   Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the M Buslon PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over ten months seeking payments that M Buslon PT was not eligible to receive under

the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physical therapists; (ii) it engaged in fee-splitting with non- physical therapists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by M Buslon PT employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

530.    Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

531.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by the Defendants through the M Buslon PT.

532.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTEENTH CAUSE OF ACTION
**Against M Buslon PT, Buslon, and the Management Defendants**
**(Common Law Fraud)**

533.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

534.     M Buslon PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

535.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that M Buslon PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non- physical therapists; (ii) in every claim, the representation that M Buslon PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact M Buslon PT was not properly licensed in that it engaged in illegal fee-splitting with non- physical therapists and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Buslon, the representation that the billed-for services were performed by M Buslon PT's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

536. M Buslon PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through M Buslon PT that were not compensable under the No-Fault Laws.

537. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $41,000.00 pursuant to the fraudulent bills submitted by the Defendants through M Buslon PT.

538. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

539. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against M Buslon PT, Buslon, and the Management Defendants
### (Unjust Enrichment)

540. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

541. As set forth above, M Buslon PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

542. When GEICO paid the bills and charges submitted by or on behalf of M Buslon PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

543.    M Buslon PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

544.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

545.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $41,000.00.

### EIGHTEENTH CAUSE OF ACTION
**Against Mollo and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

546.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

547.    Energy Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

548.    Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Energy Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Energy Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-chiropractors; (ii) it engaged in fee-splitting with non- chiropractors and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined,

fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Energy Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

549.    Energy Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mollo and the Management Defendants operated Energy Chiro, inasmuch as Energy Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Energy Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Energy Chiro to the present day.

550.    Energy Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Energy Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Energy Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

551.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,000.00 pursuant to the fraudulent bills submitted by the Defendants through Energy Chiro.

552.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Mollo, the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

553.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

554.   Energy Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

555.   Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with Energy Chiro.

556.   Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Energy Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Energy Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-chiropractors; (ii) it engaged in fee-splitting with non- chiropractors and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were

performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Energy Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

557. Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

558. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Energy Chiro.

559. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against Energy Chiro, Mollo, and the Management Defendants**
**(Common Law Fraud)**

560. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

130

561.     Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

562.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Energy Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non- chiropractors; (ii) in every claim, the representation that Energy Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Energy Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Mollo, the representation that the billed-for services were performed by Energy Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

563.     Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Energy Chiro that were not compensable under the No-Fault Laws.

564.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,000.00 pursuant to the fraudulent bills submitted by the Defendants through Energy Chiro.

565.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

566.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Energy Chiro, Mollo, and the Management Defendants**
**(Unjust Enrichment)**

567.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

568.    As set forth above, Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

569.    When GEICO paid the bills and charges submitted by or on behalf of Energy Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

570.    Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

571.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

572.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $63,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Mollo and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

573.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

574.    ACH Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

575.    Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the ACH Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that ACH Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non- chiropractors; (ii) it engaged in fee-splitting with non- chiropractors and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by ACH Chiro employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be

133

submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

576.    ACH Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mollo and the Management Defendants operated ACH Chiro, inasmuch as ACH Chiro never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for ACH Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through ACH Chiro to the present day.

577.    ACH Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. ACH Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ACH Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

578.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through ACH Chiro.

579.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Mollo, the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

580.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

581.     ACH Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

582.     Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with ACH Chiro.

583.     Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the ACH Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that ACH Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-chiropractors; (ii) it engaged in fee-splitting with non-chiropractors and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by ACH Chiro employees; and (v) the billing codes used

135

for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

584.   Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

585.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through the ACH Chiro.

586.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against ACH Chiro, Mollo, and the Management Defendants
### (Common Law Fraud)

587.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

588.   ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent

charges seeking payment for the Fraudulent Services.

589.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ACH Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-chiropractors; (ii) in every claim, the representation that ACH Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact ACH Chiro was not properly licensed in that it engaged in illegal fee-splitting with non-chiropractors and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Mollo, the representation that the billed-for services were performed by ACH Chiro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

590.    ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ACH Chiro that were not compensable under the No-Fault Laws.

591.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through ACH Chiro.

592.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

593.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against ACH Chiro, Mollo, and the Management Defendants
### (Unjust Enrichment)

594.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

595.     As set forth above, ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

596.     When GEICO paid the bills and charges submitted by or on behalf of ACH Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

597.     ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

598.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

599.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $71,000.00.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Deng and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

600.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

601.    Kings Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

602.    Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Kings Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over sixteenth months seeking payments that Kings Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non- acupuncturists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Kings Acupuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

603.    Kings Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Deng and the Management Defendants operated Kings Acupuncture, inasmuch as Kings Acupuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Kings Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Kings Acupuncture to the present day.

604.    Kings Acupuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Kings Acupuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Kings Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

605.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $30,000.00  pursuant to the fraudulent bills submitted by the Defendants through Kings Acupuncture.

606.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Deng, the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

607. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

608. Kings Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

609. Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with Kings Acupuncture.

610. Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kings Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over sixteen months seeking payments that Kings Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Kings Acupuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of

the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

611.    Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

612.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $30,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Kings Acupuncture.

613.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Kings Acupuncture, Deng, and the Management Defendants
### (Common Law Fraud)

614.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

615.    Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

616.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Kings Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-acupuncturists; (ii) in every claim, the representation that Kings Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Kings Acupuncture was not properly licensed in that it engaged in illegal fee-splitting with non-acupuncturists and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Parisien, the representation that the billed-for services were performed by Kings Acupuncture's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

617.    Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kings Acupuncture that were not compensable under the No-Fault Laws.

618.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $30,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kings Acupuncture.

619.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

620.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Kings Acupuncture, Deng, and the Management Defendants
### (Unjust Enrichment)

621.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

622.    As set forth above, Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

623.    When GEICO paid the bills and charges submitted by or on behalf of Kings Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

624.    Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

625.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

626.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $30,000.00.

## THIRTIETH CAUSE OF ACTION
### Against Zhou and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

627.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

628.    Zhou Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

629.    Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Zhou Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over fifteen months seeking payments that Zhou Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non- acupuncturists; (ii) it engaged in fee-splitting with non- acupuncturists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Zhou Acupuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

630.    Zhou Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zhou and the Management Defendants operated Zhou Acupuncture, inasmuch as Zhou Acupuncture never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Zhou Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Zhou Acupuncture to the present day.

631.    Zhou Acupuncture is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. Zhou Acupuncture likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Zhou Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

632.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,000.00 pursuant to the fraudulent bills submitted by the Defendants through Zhou Acupuncture.

633.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
### Against Zhou and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

634.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

635.    Zhou Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

636.    Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with Zhou Acupuncture.

637.    Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Zhou Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over fifteen months seeking payments that Zhou Acupuncture was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non- acupuncturists; (ii) it engaged in fee-splitting with non- acupuncturists and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by Zhou Acupuncture employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

638.   Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

639.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Zhou Acupuncture.

640.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SECOND CAUSE OF ACTION
### Against Zhou and the Management Defendants
### (Common Law Fraud)

641.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

642.   Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

643.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Zhou Acupuncture was properly

148

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Zhou Acupuncture was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact Zhou Acupuncture was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Zhou, the representation that the billed-for services were performed by Zhou Acupuncture's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

644.    Zhou Acupuncture, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Zhou Acupuncture that were not compensable under the No-Fault Laws.

645.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,000.00 pursuant to the fraudulent bills submitted by the Defendants through Zhou Acupuncture.

646.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

647.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
**Against Zhou and the Management Defendants**
**(Unjust Enrichment)**

648.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

649.    As set forth above, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

650.    When GEICO paid the bills and charges submitted by or on behalf of Zhou Acupuncture for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

651.    Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

652.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

653.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $21,000.00.

## THIRTY-FOURTH CAUSE OF ACTION
**Against Smith, Buslon, Mollo, Deng, Zhou, and the Management Defendants
(Violation of RICO, 18 U.S.C. § 1962(c))**

654.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

655.    Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture together constitute an association-in-fact "enterprise" (the "Flatbush Clinic Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

656.    The members of the Flatbush Clinic Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Strategic Medical, Alford Smith P.C., MSB PT, M Buslon PT, ACH Chiro, Energy Chiro, Kings Acupuncture, and Zhou Acupuncture ostensibly are independent entities and an unincorporated sole proprietorship – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers.

657.    The Flatbush Clinic Fraud Enterprise has been operated under at least eight different names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one source. The Flatbush Clinic Fraud Enterprise also has been operated under at least eight names in order to give the false appearance that the patient referrals between and among the members of the

Flatbush Clinic Fraud Enterprise for the Fraudulent Services were arm's-length, legitimate referrals for medically necessary services, when in fact they were not. Accordingly, the execution of this scheme would be beyond the capacity of each member of the Flatbush Clinic Fraud Enterprise acting singly or without the aid of the others.

658. The Flatbush Clinic Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

659. Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 were employed by and/or associated with the Flatbush Clinic Fraud Enterprise.

660. Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the Flatbush Clinic Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that the Flatbush Clinic Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were medically

unnecessary, illusory, unlawful, and otherwise non-reimburseable as set forth herein. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1"-"8."

661. The Flatbush Clinic Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 operate the Flatbush Clinic Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Flatbush Clinic Fraud Enterprise to the present day.

662. The Flatbush Clinic Fraud Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Flatbush Clinic Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

663. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent bills submitted through the Flatbush Clinic Fraud Enterprise.

664.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Smith, Buslon, Mollo, Deng, Zhou, the Management Defendants, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

665.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

666.    Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira are employed by and/or associated with the Flatbush Clinic Fraud Enterprise.

667.    Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Jacobson Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that the Flatbush Clinic Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were medically unnecessary, illusory, unlawful, and otherwise non-reimburseable as set forth herein. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1"-"8." Each such mailing was made in furtherance of the mail fraud scheme.

668.    Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

669.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent bills submitted through the Flatbush Clinic Fraud Enterprise.

670.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SIXTH CAUSE OF ACTION
### Against Mollo
### (Breach of Contract and Warranty)

671.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-426, above.

672.    As set forth above, pursuant to the August 2016 settlement agreement in the First Parisien Action, Mollo warranted and represented that he did not own any entities, other than Island Life Chiropractic Pain Care, P.L.L.C. and Mollo Chiropractic P.L.L.C., that had submitted any outstanding billing to GEICO.

673.    However, on August 24, 2016 – the date when Mollo executed the settlement agreement in the First Parisien Action – Mollo purported to be the owner of record of ACH Chiro.

674.     What is more, on August 24, 2016 – the date when Mollo executed the settlement agreement in the First Parisien Action – ACH Chiro had a substantial amount in outstanding billing to GEICO.

675.     Plaintiffs relied on Mollo's representations and warranties, and entered into the settlement agreement in the First Parisien Action in reliance on Mollo's representations and warranties.

676.     Plaintiffs fully performed their obligations under the settlement agreement in the First Parisien Action.

677.     Mollo's breach of his representations and warranties have caused Plaintiffs to be damaged in an amount to be determined at trial.

## JURY DEMAND

678.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Smith, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,816.96, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $61,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.   On the Fifth Cause of Action against Strategic Medical, Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Okoyechira, and Jen, more than $61,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.   On the Sixth Cause of Action against Smith, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.   On the Seventh Cause of Action against Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $15,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Cause of Action against Alford Smith P.C., Smith, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, and Jen, more than $15,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.     On the Tenth Cause of Action against Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $38,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.     On the Eleventh Cause of Action against Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $38,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.     On the Twelfth Cause of Action against MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $38,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against MSB PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $38,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $41,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $41,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against M Bulson PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $41,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against M Bulson PT, Buslon, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $41,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $63,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.     On the Nineteenth Cause of Action against Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $63,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.     On the Twentieth Cause of Action against Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $63,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.     On the Twenty-First Cause of Action against Energy Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $63,000.00, for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

V.     On the Twenty-Second Cause of Action against Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $71,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.     On the Twenty-Third Cause of Action against Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $71,000.00,  together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.     On the Twenty-Fourth Cause of Action against ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $71,000.00,  together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against ACH Chiro, Mollo, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $71,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $30,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.     On the Twenty-Seventh Cause of Action against Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $30,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $30,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.     On the Twenty-Ninth Cause of Action against Kings Acupuncture, Deng, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $30,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.    On the Thirty-First Cause of Action against Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.    On the Thirty-Second Cause of Action against Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

GG.    On the Thirty-Third Cause of Action against Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, more than $21,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

HH.    On the Thirty-Fourth Cause of Action against Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $340,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

II.    On the Thirty-Fifth Cause of Action against Smith, Buslon, Mollo, Deng, Zhou, Rybak, Tuano, Tanglao, John Doe Defendants 1-10, Jean-Baptiste, Etufugh-Nwankpa, Jen, and Okoyechira, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $340,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

JJ.    On the Thirty-Sixth Cause of Action against Mollo, for an amount to be determined at trial, plus attorneys' fees, costs, and interest and such other and further relief as this Court deems just and proper.

Dated:  August 26, 2019

RIVKIN RADLER LLP


By:   _/s/ Max Gershenoff_
      Barry I. Levy (BL 2190)
      Max Gershenoff (MG 4648)
      Joshua D. Smith (JS 3989)
      926 RXR Plaza
      Uniondale, New York 11556
      (516) 357-3000
      _Counsel for Plaintiffs Government_
      _Employees Insurance Company, GEICO_
      _Indemnity Company, GEICO General_
      _Insurance Company, and GEICO Casualty_
      _Company_